IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION


CAREY DUBBERLY,
      Petitioner,

v.                               Case No.:  5:03cv280/SPM/EMT

JAMES R. McDONOUGH,[1]
      Respondent.
_____/

## <u>ORDER, REPORT AND RECOMMENDATION</u>

This cause is before the court on Petitioner's amended petition for writ of habeas corpus filed under 28 U.S.C. § 2254 and supporting memorandum (Doc. 6).  Petitioner is represented by counsel. Respondent filed an answer and relevant portions of the state court record (Docs. 13, 14).  Petitioner filed a reply (Doc. 16).

The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D.Fla. Loc. R. 72.2(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The background and procedural history of this case is undisputed.  On November 10, 1998, following a jury trial, Petitioner was convicted in the Circuit Court in and for Bay County, Florida, of first degree murder (Doc. 14, Ex. A).  The same day, he was sentenced to life imprisonment (*id*.).

---

[1]James R. McDonough succeeded James Crosby as Secretary for the Department of Corrections, and is automatically substituted as Respondent.  *See* Fed. R. Civ. P. 25(d)(1).

Petitioner appealed his conviction and sentence to the Florida First District Court of Appeal ("First DCA") (Doc. 14, Exs. C, D, E, F).  On May 4, 2000, the First DCA affirmed the conviction and sentence per curiam without opinion, with the mandate issuing May 22, 2000 (*id.*, Ex. G).  Dubberly v. State, 758 So.2d 673 (Fla. 1st DCA May 4, 2000) (Table).

On June 27, 2001, Petitioner filed a motion for postconviction relief in the trial court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Doc. 14, Ex. H).  Following an evidentiary hearing, the state court denied the motion on May 8, 2002 (*id.*, Ex. K).  Petitioner appealed the decision to the First DCA (*id.*, Exs. L, M, N, O).  The First DCA affirmed the decision per curiam without opinion on May 20, 2003, with the mandate issuing September 25, 2003 (*id.*, Ex. P).  Dubberly v. State, 854 So.2d 196 (Fla. 1st DCA May 20, 2003) (Table).

Petitioner initiated the instant section 2254 action on October 31, 2003 (Doc. 1 at 1).  He filed an amended petition on December 4, 2003, in which he presents seven grounds of ineffective assistance of trial counsel, seven grounds of trial court error, one claim that the cumulative impact of the errors of trial counsel and the trial court rendered his trial fundamentally unfair, and one claim of "newly discovered evidence" (Doc. 6 at 5 to 5f).

II.    TIMELINESS

Respondent concedes that the original petition was filed within the limitation period (Doc. 13 at 6).  However, Respondent asserts that unless the original petition tolled the limitation period, the amended petition was untimely (*id.*).

It is well established that an application for federal habeas review does not toll the limitation period of section 2244(d)(2).  Duncan v. Walker, 533 U.S. 167, 181-82, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001).  However, the amendment to the original petition may be timely if it "relates back" to the original petition.  Rule 15(c) of the Federal Rules of Civil Procedure provides that an amendment of a pleading relates back to the date of the original pleading when the claim "asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading . . . ."  Thus, as long as the amended pleading is based on the same series of transactions and occurrences alleged in the original pleading, the revised pleading will relate back to the filing date of the original pleading, even where the revised pleading contains legal theories not included in the original.  White v. White Rose Food, a Div. of DiGiorgio Corp., 128

F.3d 110, 116 (2d Cir. 1997). The transaction or occurrence must, however, be based upon the same core facts originally alleged. In general, relation back is permitted under Rule 15(c)(2) where an amended complaint asserts a new claim on the basis of the same core of facts, but involving a different substantive legal theory than that advanced in the original pleading. Bularz v. Prudential Ins. Co. of America, 93 F.3d 372, 379 (7th Cir. 1996) (citations omitted). *Accord*, Alpern v. UtiliCorp United, Inc., 84 F.3d 1525, 1543 (8th Cir. 1996). If, however, a party attempts to interject entirely different conduct or different transactions or occurrences into a case, relation back is not allowed.

Claims made in a federal habeas petition are functionally no different than claims made in other civil litigation. Rule 2(c) of the Rules Governing § 2254 Cases requires that a § 2254 petition specify all the grounds for relief which are available to the petitioner and of which he has or by the exercise of reasonable diligence should have knowledge and shall set forth in summary form the facts supporting each of the grounds thus specified. Thus, the initial petition must set forth all available grounds, and each ground must be supported by a summary of facts. The summary of facts provides a basis to determine whether the proposed amended claim arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original motion. Fed. R. Civ. P. 15(c)(2). If it does, and if the initial petition was timely, the amendment containing the new claim will also be timely because it relates back to the original petition.

Following these precepts, courts have applied the relation back doctrine to habeas petitions. In United States v. Craycraft, 167 F.3d 451 (8th Cir. 1999), the Eighth Circuit found that a claim of ineffective assistance of counsel for failing to file an appeal did not relate back for limitations purposes to an original petition that contained claims of ineffective assistance based on failure to take certain actions at the sentencing hearing. *See also* United States v. Duffus, 174 F.3d 333 (3d Cir. 1999), *cert. denied*, 120 S.Ct. 163, 145 L.Ed.2d 138 (1999). In McClain v. Hill, 52 F.Supp.2d 1133 (C.D. Cal. 1999), a claim of error on appeal was held not to relate back to a petition asserting claims of trial error. In United States v. Pittman, 209 F.3d 314, 318 (4th Cir. 2000), the Fourth Circuit found that a claim of improper sentencing enhancement based on obstruction of justice did not relate back to an initial petition that claimed improper enhancement based on a previous conviction.

Generally, then, courts have denied relation back when the new claims "arise from separate occurrences of 'both time and type,'" or when the original claims do not provide the respondent with notice or awareness of the new claims. <u>Pittman</u>, 209 F.3d at 318; <u>Craycraft</u>, 167 F.3d at 457. Whether a new claim could have been included in the original petition should also be considered. <u>Pittman</u>, 209 F.3d at 318.

In the instant case, Petitioner's amended petition does not include new claims that were not presented in the original petition. The amended petition is different from the original petition only in form. Therefore, the undersigned concludes that the amended petition relates back to the filing date of the original pleading. As the original petition was filed within the statutory limitation period, the amended petition is timely.

III.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws of the United States." As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for federal habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19.

Section 2254 now provides:

(d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
          (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
          (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254 (West Supp. 2001).

The United States Supreme Court explained the framework of review under § 2254(d)(1) in Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).[2]  The appropriate test in habeas cases was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied - the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id., 529 U.S. at 412-13; Ramdass v. Angelone, 530 U.S. 156, 120 S.Ct. 2113, 2119-20, 147 L.Ed.2d 125 (2000).

The Eleventh Circuit has developed a three-step process for applying the Williams test to any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal state court proceeding.  See Wellington v. Moore, 314 F.3d 1256, 1260-61 (11th Cir. 2002); Robinson v. Moore, 300 F.3d 1320, 1343-45 (11th Cir. 2002).  First, the court must ascertain the controlling legal principles that are clearly established by the Supreme Court at the time of the state court adjudication.  Wellington, 314 F.3d at 1260; Robinson, 300 F.3d at 1343.  Second, the court must determine whether the state court adjudication was contrary to the clearly established Supreme Court law.  Wellington, 314 F.3d at 1260, Robinson, 300 F.3d at 1344.  "The 'contrary to' clause in § 2254(d)(1) 'suggests that the state court's decision must be substantially different' from the

---

[2]Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-375, 390-399, 120 S.Ct. at 1499-1503, 1511-1516); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and ---except as to the footnote – Scalia) in part II (529 U.S. at 403-413, 120 S.Ct. at 1518-1523).  The opinion of Justice Stevens in Part II was joined by Souter, Ginsburg, and Breyer.

relevant Supreme Court precedent."  Wellington, 314 F.3d at 1260 (quoting Fugate v. Head, 261 F.3d 1206, 1216 (11th Cir. 2001), *cert. denied*, 535 U.S. 1104, 122 S.Ct. 2310, 152 L.Ed.2d 1065 (2002)  (quoting Williams, 529 U.S. at 405)).  "Although a state court's decision that 'applies a rule that contradicts' the governing Supreme Court law is 'contrary,' a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law."  Wellington, 314 F.3d at 1260 (citing and quoting Williams, 529 U.S. at 404-06).  If the state court applied the correct Supreme Court precedent, and the United States Supreme Court, faced with materially indistinguishable facts, has not reached a decision different from the decision reached by the state court in the petitioner's case, the case does not fit within the "contrary to" clause, and the federal habeas court must proceed to the third step and determine whether the state court "unreasonably applied the relevant Supreme Court authority."  Fugate, 261 F.3d at 1216.  Likewise, if the facts of the Supreme Court cases and the petitioner's case are not substantially similar, "a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law."  *Id.* (citing and quoting Williams, 529 U.S. at 406).  A state court is not required to cite Supreme Court cases or even be aware of the cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002).

The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 410.  The Supreme Court has explained that "a federal habeas court may not issue a writ under the unreasonable application clause 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'"  Bell v. Cone, 535 U.S. 685, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (quoting Williams, 529 U.S. at 411).  Indeed, "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."  Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 1175, 155 L.Ed.2d 144 (2003).  A state court's incorrect application of clearly established law will be held to be reasonable and not warrant a writ unless "thorough analysis by

a federal court produces a firm conviction that that [the state court] judgment is infected by constitutional error." Williams, 529 U.S. at 389. "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." Yarborough v. Alvarado, 541 U.S. 652, 124 S.Ct. 2140, 2149, 158 L.Ed.2d 938 (2004) (citation omitted). Although § 2254(d)(1) is concerned only with federal law as clearly established by the Supreme Court, this court may look to circuit precedent to demonstrate reasonable applications of Supreme Court precedent. Van Poyck v. Fla. Dep't of Corrections, 290 F.3d 1318, 1322 n. 4 (11th Cir. 2002).

In deciding whether a state court decision involved "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding" under § 2254(d)(2), determinations of fact are "presumed to be correct," unless the presumption is rebutted by Petitioner "by clear and convincing evidence." Section 2254(e)(1); see Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)." (dictum)); Fugate, 261 F.3d at 1215 (quoting 28 U.S.C. § 2254(e)(1)); Parker v. Head, 244 F.3d 831, 835-36 (11th Cir. 2001) (citing § 2254(d)(2) and (e)(1)); see also Crawford v. Head, 311 F.3d 1288 (11th Cir. 2002) (explaining that the new statute provides a "highly deferential standard of review" of the state court's factual determinations). Thus, not only must the state court's factual determination have been unreasonable, but the court's factual findings must be shown unreasonable by clear and convincing evidence. See Callahan v. Campbell, 427 F.3d 897, 926 (11th Cir. 2005) (citing § 2254(e)(1); Rutherford v. Crosby, 385 F.3d 1300, 1308 (11th Cir. 2004) (concluding that "[petitioner] has not shown by clear and convincing evidence that the Florida Supreme Court's factual finding . . . [wa]s unreasonable in light of the evidence in the state court record")).

III.    EXHAUSTION AND DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[3] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim.  Duncan, 513 U.S. at 365-66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); Picard, 404 U.S. at 277-78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," id., 404 U.S. at 278, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court.  In Anderson v. Harless, 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the

---

[3]Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
    (A)  the applicant has exhausted the remedies available in the courts of the State; or
    (B) (i)  there is an absence of available State corrective process; or
        (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt.  *Id.* 459 U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979)). The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law."  Anderson, 459 U.S. at 7 (internal quotation marks omitted).  The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim.  *Id.*, 459 U.S. at 7 and n.3. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  *Id.*

　　Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364.  The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[4]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court."  Duncan, 513 U.S. at 365-66.   Recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that  "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  Baldwin v. Reese, 541 U.S. 27, 124 S.Ct. 1347, 1351, 158 L.Ed.2d 64 (2004). The Baldwin Court commented that "a litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in

---

　　　　[4]The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"  *Id.*

Prior to Duncan, the Eleventh Circuit broadly interpreted the "fair presentation" requirement. *See*, *e.g.*, Watson v. Dugger, 945 F.2d 367 (11th Cir. 1991) (finding issue to be exhausted when petitioner argued in state court that trial court had failed to follow state law which required proof of all elements of the crime, and argued in federal court that this was a due process violation); Mattox v. Dugger, 839 F.2d 1523 (11th Cir. 1988) (holding that a federal habeas corpus petition should not be dismissed on grounds of procedural default when a petitioner has previously brought an issue before a state court alleging only state law violations, when such a claim is equally supported by federal law, and the state cites such federal law in support of its position).  However, after Duncan, the Eleventh Circuit has taken a more restrictive approach.  For example, in Zeigler v. Crosby, the Circuit Court held that the habeas petitioner failed to "fairly present" his juror misconduct claims to the state courts where his brief to the state appellate court did not refer to the federal constitutional issues raised in his federal habeas petition, and none of the cases cited in his direct appeal discussed the Federal Constitution.  345 F.3d 1300, 1307 (11th Cir. 2003).  The court specifically noted that the section of the petitioner's appellate brief which dealt with juror misconduct contained the words: "Appellant was denied due process and a fair trial . . .," which could be interpreted as asserting a fair trial claim under the Florida Constitution and Florida's Due Process Clause.  *Id.* at 1308 n.5.  The only cases cited in the discussion of the issue in petitioner's state appellate brief were state supreme court cases that made no mention of the United States Constitution and cited no federal cases.  The court concluded that petitioner's "[c]ursory and conclusional sentence (unaccompanied by citations to federal law), . . . did not present to the Florida courts the federal claim asserted to us."  *Id.*

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review.  O'Sullivan, 526 U.S. at 839-40, 848.  This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default.  *See* Coleman v. Thompson, 501 U.S. 722, 734-35 and n.1, 111 S.Ct. 2546, 2555 and n.1, 115 L.Ed.2d 640 (1991); Caniff v. Moore, 269 F.3d 1245,

1247 (11ᵗʰ Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326-27 (11ᵗʰ Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11ᵗʰ Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11ᵗʰ Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L.Ed.2d 812 (1991).  However, a petitioner may obtain federal review of his claim if the state procedural rule is applied in an "arbitrary or unprecedented fashion," Judd v. Haley, 250 F.3d 1308,1313 (11ᵗʰ Cir. 2001), or in a manifestly unfair manner.  Ford v. Georgia, 498 U.S. 411, 424-25, 111 S.Ct. 850, 858, 112 L.Ed.2d 935 (1991); Upshaw v. Singletary, 70 F.3d 576, 579 (11ᵗʰ Cir. 1995).

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim.  Tower, 7 F.3d at 210; Parker, 876 F.2d 1470.  "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim."  McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L.Ed.2d 397 (1986)).  Lack of counsel or ignorance of available procedures is not enough to establish cause.  Tower, 7 F.3d at 210.  To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Schlup v. Delo, 513 U.S. 298, 327, 115 S.Ct. 85, 130 L.Ed.2d 808 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him."  Schlup, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

*Id.*

Within this framework, the court will review Petitioner's claims.

## IV.    PETITIONER'S CLAIMS

### A.    Grounds one and two:  Ineffective assistance of trial counsel.

Petitioner originally claimed that his counsel was ineffective for failing to adequately investigate and present a defense of voluntary intoxication and/or diminished mental capacity (suicidal ideation) (Doc. 6 at 4).  However, in his reply to Respondent's answer, Petitioner conceded that counsel did not err is failing to present a defense of diminished capacity (*see* Doc. 16 at 8). Thus, the only remaining issue is whether Petitioner received ineffective assistance of counsel with regard to counsel's failure to investigate and present evidence to support a voluntary intoxication defense.

Petitioner states he had a history of chronic alcohol abuse (Doc. 6 at 4).  He states that during his first meeting with his defense counsel, Attorney Walter Smith, he told Smith that he was drinking at the time he shot his ex-wife, and he was having difficulty recalling the shooting (*id*. at 7-8).  Additionally, during pre-trial discussions, Petitioner told Smith that he had been treated for alcoholism in Virginia in 1993, and at Eglin/Tyndall Air Force Base in the Spring of 1996, and that he had been discharged from treatment at Lakeview Center of Baptist Hospital the day before the shooting (*id*. at 7).  Petitioner alleges that Smith obtained Petitioner's medical records from Bay Medical Center, where Petitioner was treated for a self-inflicted gunshot wound after he shot his ex-wife, and the records showed that Petitioner's blood/alcohol level was .15 (*id*. at 8).

Petitioner alleges that Attorney Smith learned through discovery and interviews with Petitioner that during the two weeks prior to the murder, Petitioner had spent considerable time with Ms. Alta Love and Mr. Joe Vann, who could testify that they had observed Petitioner drinking excessively to the point of heavy intoxication, and they overheard him repeatedly threaten to commit suicide on a certain day (*id*. at 9).  Attorney Smith did not interview or depose Ms. Love or Mr. Vann, and he failed to present their testimony at trial in support of a voluntary intoxication defense (*id*.).

Additionally, Petitioner contends counsel performed deficiently by failing to present expert testimony to support a voluntary intoxication defense (*id*. at 4).  He alleges Attorney Smith had available to him the opinion of a clinical psychologist, Dr. Gilgun, that the effect of Petitioner's history of alcohol consumption had resulted in significant neurological impairment and liver

dysfunction, which rendered him unable to metabolize alcohol and minimize its impairing effect (*id.* at 12).

                1.        Clearly Established Supreme Court Law

       The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  466 U.S. at 687-88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.  Thus, this court need not address the prejudice prong if the court determines that the performance prong is not satisfied.  Turner v. Crosby, 339 F.3d 1247, 1279 (11th Cir. 2003), *cert. denied*, 541 U.S. 1034, 124 S.Ct. 2104, 158 L.Ed.2d 718 (2004); Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation omitted).

       "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."  Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688-89.  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.* at 689.  If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial--for example, what witnesses he presented or did not present--were acts that some lawyer might do." Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314-15 n.15).  Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so."  Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).  Counsel's performance is

deficient only if it is "outside the wide range of professional competence." <u>Jones</u>, 436 F.3d at 1293 (citing <u>Strickland</u>, 466 U.S. at 690); <u>Lancaster v. Newsome</u>, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").

Moreover, "[c]ounsel will not be deemed unconstitutionally deficient because of tactical decisions." <u>McNeal v. Wainwright</u>, 722 F.2d 674, 676 (11th Cir.1984) (citations omitted); <u>Crawford</u>, 311 F.3d at 1312 ("Deliberate choices of trial strategy and tactics are within the province of trial counsel after consultation with his client. In this regard, this court will not substitute its judgment for that of trial counsel.") (quotation marks, internal alteration, and citation omitted). There is a strong presumption that counsel's performance was reasonable and adequate, with great deference being shown to choices dictated by reasonable strategy. <u>Rogers</u>, 13 F.3d at 386; *see also* <u>Conklin v. Schofield</u>, 366 F.3d 1191, 1204 (11th Cir. 2004), *cert. denied*, 474 U.S. 1038-, 125 S.Ct. 1703, 161 L.Ed.2d 531 (2005). "[T]here are no 'absolute rules' dictating what reasonable performance is or what line of defense must be asserted." <u>Michael v. Crosby</u>, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting <u>Chandler</u>, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence -- which is also constitutionally protected -- and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting <u>Putman v. Head</u>, 268 F.3d 1223, 1244 (11th Cir. 2001)).

"In general, defense counsel renders ineffective assistance when [he] fails to investigate adequately the sole strategy for a defense or to prepare evidence to support that defense." <u>Fortenberry v. Haley</u>, 297 F.3d 1213, 1226 (11th Cir. 2002). Counsel's duty to investigate "requires that counsel 'conduct a substantial investigation into any of his client's plausible lines of defense.'" *Id.* (citation omitted).

Counsel's decision whether to call a particular witness is a matter of trial strategy entitled to great deference. <u>Chandler</u>, 218 F.3d at 1314 n.14 (citing <u>Waters v. Thomas</u>, 46 F.3d 1506, 1512, 1518-19 (11th Cir. 1995) (en banc)). "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." <u>Waters</u>, 46 F.3d at 1514. "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and

because allegations of what a witness would have testified are largely speculative." <u>Buckelew v.</u>
<u>United States</u>, 575 F.2d 515, 521 (5th Cir. 1978).

    2.    Federal Review of State Court Decision

Respondent concedes that Petitioner exhausted all of the ineffective assistance of counsel
claims presented in the instant petition by presenting them to the state courts in his Rule 3.850
motion (Doc. 13 at 10, 21, 25, 35, 40, 47, 53).   The state court's written decision contains the
following analysis of all of Petitioner's ineffective assistance of counsel claims:

> After hearing testimony of trial counsel this Court finds that the decisions of counsel
> fall within the realm of tactical decisions that do not entitle the Defendant to relief.
> Furthermore, any errors were at most, harmless and the Defendant fails to satisfy the
> second prong of the *Strickland* analysis.

(Doc. 14, Ex. K).   Thus, the state court concluded that Petitioner failed to satisfy the performance
and prejudice prongs of the <u>Strickland</u> standard (*id*.).

Petitioner's trial counsel testified at the evidentiary hearing on Petitioner's Rule 3.850
motion (Doc. 14, Ex. I at 219-63).[5]   Attorney Smith testified that he had been practicing law since
1980 (Petitioner was convicted in November of 1998), and that he had handled all of the first degree
murder cases for the Public Defender's Office in the Fourteenth Judicial Circuit, which amounted
to twenty-nine (29) cases (*id*. at 261).

Attorney Smith stated that he knew Petitioner was an alcoholic and had a history of
alcoholism (*id*. at 220).   Smith testified that he looked at the issue of Petitioner's alcoholism
"closely" because the State did not waive the death penalty until close to trial, so he attempted to
accumulate all of Petitioner's records, including his military records, and records concerning his
alcoholism and hospitalization for alcoholism (*id*.).   Attorney Smith stated, "[I]f we could have
gotten them, we got them" (*id*.).   Smith testified that most of the gathering of records regarding
Petitioner's alcoholism was done in preparation for a penalty phase proceeding, and once the State
waived the death penalty, the records of Petitioner's history of alcohol became of secondary
importance (*id*. at 220, 233-34).   Smith testified that in addition to gathering the records, he

---

[5]Some portions of the state court record contain two page numbers at the bottom of each page.  In this Report
and Recommendation, when a reference is made to such a page, the page number referenced corresponds to the page
number at the bottom right of the page.

contacted a bartender at the White Caps Bar who had seen Petitioner on the morning of the shooting regarding Petitioner's alcohol consumption, and the bartender said Petitioner was acting normally (*id*. at 221, 246-47).

Attorney Smith testified that he procured Dr. Lawson, a clinical psychologist, to evaluate Petitioner (*id*. at 222).  One of the things Smith discussed with Dr. Lawson was alcoholism and the role it may have played in the homicide (*id*.).  Smith testified that he did not believe he had sufficient evidence to present Dr. Lawson as a trial witness, based "probably" on Dr. Lawson's statement that he could not testify regarding Petitioner's mental condition at the time of the shooting, except to say that Petitioner had consumed alcohol (*id*.).  Smith testified that in his experience, he had never had a psychologist willing to offer an opinion that a defendant could not have formed a premeditated intent to commit a murder (*id*.)

With regard to expert testimony concerning a specific blood/alcohol content, Attorney Smith testified that in his experience, the only opinion that an expert would offer was that alcohol affects different people in different ways, and without observing a specific defendant with a specific blood alcohol reading, the expert could not give a professional opinion as to how a defendant would have been affected (*id*. at 223-24).  Attorney Smith stated that that was the answer he always received from experts regarding a specific blood/alcohol level (*id*.).  When asked whether he talked to any experts that could have given an opinion that a blood/alcohol level of .15 constituted substantial intoxication, Attorney Smith testified that he did not recall what Dr. Lawson told him, but if Dr. Lawson had indicated a willingness to testify that Petitioner's blood alcohol level was such that he would not have known what day it was, or would not have known where he was, or words to that effect, he would have used that testimony (*id*. at 224-25).

On cross-examination, Attorney Smith testified that he did not consider hiring an expert to prepare a retrograde extrapolation to determine Petitioner's blood/alcohol level at the time of the shooting because Petitioner bled a lot and received fluids intravenously, and it would have been difficult to find an expert who could account for those factors in an extrapolation (*id*. at 244).  Attorney Smith conceded that the fact that Petitioner's blood/alcohol level could have been higher than .15 at the time of the shooting could have been an important consideration in a voluntary intoxication defense but, based upon his experience, voluntary intoxication was not a successful

defense (*id*. at 244-46).  Indeed, in his years of practice, the only time a jury had accepted the defense was when the defendant was hallucinating from intoxication at the time he committed the crime (*id*. at 262-64).

Attorney Smith testified that even though he did not believe there was sufficient evidence to support a voluntary intoxication defense, he presented Petitioner's testimony regarding his history of alcohol abuse and his alcohol consumption on the day of the murder, presented Petitioner's medical records from that day showing a blood/alcohol level of .15, successfully requested jury instructions on the voluntary intoxication defense and that a person with a blood/alcohol level of .08 is legally presumed to be impaired by alcohol, presented evidence of Petitioner's intoxication, and argued to the jury that the alcohol mentally impaired Petitioner and inflamed his emotions to the degree that the murder was not premeditated, but was "spur of the moment" (*id*. at 262-63).

Dr. Lawrence Gilgun, who has a doctorate degree in clinical psychology, also testified at the state post-conviction hearing.  He testified that he had previously testified as an expert in the areas of competency to stand trial, insanity defenses, qualification for involuntary hospitalization, and mitigating circumstances in capital cases (*id*. at 265-66).  He stated he had been qualified as an expert in approximately 800 cases (*id*.).  Dr. Gilgun testified that Attorney Smith contacted him and stated that he had employed Dr. Lawson, another clinical psychologist, to examine Petitioner, and Dr. Lawson had concluded that Petitioner's alcoholism played a major role in his behavior at the time of the murder (*id*. at 267-68).  Attorney Smith asked Dr. Gilgun, a neuropsychologist as well as a clinical psychologist, to conduct a neuropsychological evaluation of Petitioner (*id*.).

Dr. Gilgun testified that Petitioner described a 30-year history of severe alcohol dependence (*id*. at 268-72).  He stated that Petitioner had "widespread severe deficits" in neuropsychological functioning (*id*. at 269).  He testified that Petitioner was "much more impaired" than the average individual in terms of basic neuropsychological skills, including motor functions, rhythm functions, tactile functions, visual functions, receptive speech, expressive speech, writing, reading, arithmetic, memory, and intellectual processing (*id*.).  Dr. Gilgun testified that out of five general indicators of brain dysfunction, Petitioner displayed all five (*id*.).

Dr. Gilgun explained that initially, alcoholics develop a tolerance for alcohol such that they can function while they are under the influence of alcohol, but they are not necessarily functioning

well (*id.* at 271).  He stated that as the disease progresses, the liver becomes unable to metabolize alcohol such that "toward the end," most alcoholics become very intoxicated if they drink one or two shots of hard spirits (*id.*).  Dr. Gilgun testified that based upon Petitioner's self-reported history of thirty years of heavy drinking, and Petitioner's self-reported liver damage, he believed Petitioner was in the "end stages" of alcoholism (*id.* at 272).  Dr. Gilgun stated that he was aware, from Petitioner's self-report and the hospital records showing Petitioner's blood/alcohol level was .15 one hour after the shooting, that Petitioner had been drinking on the day he committed the murder (*id.* at 272, 279).  He testified that based upon Petitioner's statement that he started drinking earlier that morning, "one would assume" that Petitioner's blood/alcohol level was higher than .15 at the time of the shooting (*id.* at 278-79).  However, because one's blood/alcohol level gradually increases upon consumption of alcohol, if Petitioner consumed alcohol immediately before the shooting, his blood/alcohol level may have been lower at the time of the shooting and then gradually increased (*id.*).

Dr. Gilgun testified that he discussed his findings and conclusions with Dr. Lawson, but he did not discuss them with Attorney Smith, nor did Smith request that he prepare a report for trial (*id.* at 275).

On cross-examination, Dr. Gilgun testified that his opinion was based entirely on information he received from Petitioner (*id.* at 276).  Dr. Gilgun admitted that his conclusion that Petitioner was in the "end stages" of alcoholism and suffered from an inability to metabolize alcohol was inconsistent with the statements of persons who observed that Petitioner acted normally just before the murder:

> Q [by the State].        And if you have the Defendant . . . at the same time when he's supposed to be very toxic toward alcohol, if other individuals are saying he's acting normal, he's looking normal, he's doing what a normal person would be, that would be a sort of a conflict because on one hand he should be falling, stumbling, acting drunk, because of the toxic element of his, of his liver from his bad drinking?
>
> A.        Correct.
>
> Q.        So if he's not doing those things, we'd have to assume that maybe he's not had as much alcohol or he's found a way of dealing with it because it's not

going with what your theory would be, which is that if he had a bunch of liquor he would be acting crazy?

> A.     Yes.

(*id*. at 276).

Following the parties' questioning of Dr. Gilgun, the state court judge conducted a brief inquiry:

> THE COURT:          . . . So could you have testified at the trial in 1998 that he was so intoxicated at the time of the offense that he could not form the specific intent to murder his wife?

> THE WITNESS:     No.

> THE COURT:     All right.  So you really didn't have enough information, and since you didn't see him until much later, as to what was really going on at the time of the offense, is that correct?

> THE WITNESS:     Yes, ma'am.

(*id*. at 281-82).

Clifford Davis, a criminal defense attorney with twenty-five years of experience, testified as an expert at the state post-conviction hearing (*id*. at 282-84).  He stated that he has prepared hundreds of cases for trial, and defended approximately twenty-five (25) first degree murder cases (*id*. at 285-86).  Mr. Davis testified that he had never used a voluntary intoxication defense "directly," but often as a "mitigating factor," and once or twice "bearing not directly but maybe tangentially on the issue of intent" (*id*. at 287).   In response to Petitioner's counsel's question of whether he would have presented a voluntary intoxication defense, he stated:

> I can't answer that affirmatively without some qualifiers, and the qualifiers being, as I understand the facts of this case, there was no question that the death was brought about by the hands of Mr. Dubberly, so that leaves you then with some statutory defenses that you have to consider:  self-defense would appear to be obviously out; insanity, from what I have seen of the cases, he didn't meet the standard for, the McNaughton [sic] standard as modified and used in Florida; and you sort of tick through the various defenses you have and it appears to me in this case I would have to very strongly consider a voluntary intoxication because it was one of the few defenses left that had some basis for utilizing.

(*id*. at 287-88).  Mr. Davis testified, ". . . what I see in this case is the absence of other defenses and when the issue is Mr. Dubberly killed his wife and the question was what degree should it be?  Well, the degree goes all the way down to manslaughter or down to not guilty because of intoxication." (*id*. at 290).  He stated, "I think that defense would play to some extent to each level, whether it would be first degree or second degree, without premeditation, felony murder, if that applied under the facts, and manslaughter." (*id*.).  Mr. Davis testified that in preparing a defense of voluntary intoxication, he would have presented expert testimony at trial (*id*. at 289-90).  He further testified that Attorney Smith's failure to further investigate and present a voluntary intoxication defense satisfied the Strickland standard (*id*. at 303).

The undersigned will first analyze the prejudice prong of the Strickland standard.  As discussed *supra*, the court need not examine both prongs if Petitioner cannot satisfy one of them. In assessing Strickland prejudice, this court must re-weigh the evidence of guilt against the totality of available evidence in support of a voluntary intoxication defense.  *See* Wiggins v. Smith, 539 U.S. 510, 534, 123 S.Ct. 2527, (2003).  However, this review is circumscribed by a state court conclusion that Petitioner failed to satisfy the prejudice prong of the Strickland analysis.

As Petitioner concedes, there was no question that he shot his ex-wife, the only issue was whether the murder was premeditated (*see* Doc. 16 at 6-7).  The State presented the following evidence to establish Petitioner's guilt:

(1)  Testimony from Maro Malki, an employee of Bahama Gun and Pawn (Doc. 14, Ex. B, Vol. II at 62).  She testified that on March 12, 1998, one week prior to the shooting, Petitioner initiated the process of buying the firearm that he used in the murder (*id*.).  Petitioner actually took possession of the firearm on March 18, 1998, the day before the shooting (*id*. at 66-67).

(2)  Testimony from John Bacia, a former neighbor of Petitioner's (Doc. 14, Ex. B, Vol. II at 72).  He testified that he lived next door to the house that the victim and Petitioner shared until March of 1998, when Petitioner moved out of the house (*id*.).  Mr. Bacia testified that approximately two years prior to the shooting, Petitioner stated that if the victim "ever tried to get the house," he would kill her (*id*. at 73, 78-79).  Mr. Bacia said the same topic came up approximately 3-6 months later, roughly a year and a half before the murder (*id*. at 74, 78-79).

(3)   Testimony from Gregory George, a pastor of a local church, that he talked with Petitioner for approximately forty-five (45) minutes on the evening before the murder (Doc. 14, Ex. B, Vol. III at 100-02).  Mr. George stated that Petitioner expressed that he was frustrated with his financial situation because he felt he had no control over his funds, and he related this lack of control to his ex-wife, the victim (*id*. at 103).  Mr. George testified that in his position as a pastor, he had a lot of contact with alcoholics (*id*.).  He further testified that Petitioner appeared to be impaired by alcohol at the time of their discusion because he acted lethargic, and his eyes were glassy; however, his speech was not slurred, and he appeared to otherwise be controlling his behavior enough that he appeared unimpaired to most people (*id*. at 103-05).  He testified that Petitioner appeared able to appreciate the wrongfulness of his drinking because he expressed guilt about drinking immediately after leaving a detoxification program (*id*. at 106).

(4)  Testimony from Ms. Odie Ranier, with whom Petitioner lived at the time of the shooting. Ms. Ranier testified that on the day of the murder, Petitioner left her house at approximately 11:00 or 11:15 a.m. to have an early lunch (Doc. 14, Ex. B, Vol. II at 87-88).  She had been with him all morning until that point and had not seen him consume alcohol (*id*. at 88).  Petitioner returned to Ms. Ranier's house at 1:00 p.m., made a phone call, and then went to the Tyndall Credit Union, which was approximately a five-minute drive from her house (*id*. at 89-92).  Ms. Ranier testified that when Petitioner left to go to the credit union, he was acting normally; he was not stumbling or staggering, or slurring his speech (Doc. 14, Ex. B, Vol. II at 92, Vol. III at 88).

(5)   Testimony from Charlie Collins, an employee of the victim's mortgage brokering business (Doc. 14, Ex. B, Vol. IV. at 48).  He testified that he was working with the victim at her office on the day of the shooting (*id*.).  Between 1:00 and 1:30 p.m. that day, Petitioner telephoned the office (*id*.).  Mr. Collins answered the telephone, and Petitioner asked to speak with the victim (*id*. at 48-49).  The victim spoke with Petitioner and then left the office, stating that she was going to meet Petitioner to collect tax records (*id*. at 49-51).  Mr. Collins stated that Petitioner was friendly, and there was nothing unusual about his voice when they spoke (*id*. at 49-50); however, Petitioner telephoned again at approximately 1:20 p.m., and he was "curt, short" when Mr. Collins told him that the victim had already left to meet him (*id*. at 50).

(6)  Testimony from Tien Diep, who was sitting in her car in the parking lot of the credit union at the time of the shooting (Doc. 14, Ex. B, Vol. II at 23-24).  She testified that at approximately 1:30 p.m., the victim exited her (the victim's) car when Petitioner's vehicle arrived at the parking lot (*id*. at 24, 26).  Ms. Diep stated that the victim and Petitioner walked towards each other, and Petitioner was carrying a small box (*id*.).  When Petitioner met the victim, he pulled a gun out of the box and shot the victim in the head, and then immediately shot himself in the head (*id*. at 27).  Ms. Diep testified that Petitioner looked "very normal" (*id*. at 33).  When the prosecutor asked her if he stumbled or did anything that made him appear drunk, Ms. Diep replied that she saw him walk forward to meet the victim and take the gun out of the box "very fast" (*id*. at 36-37).

(7)  Testimony from Donald Jones, an employee of the credit union who was working there on March 19, 1998, the day of the shooting (Doc. 14, Ex. B, Vol. II at 51).  Mr. Jones stated that he observed Petitioner and the victim lying on the ground after the shooting (*id*.).  He then saw Petitioner reach toward the victim and heard him say, "Take me to jail." (*id*.).

(8)  Testimony from Michael Chimiengo, a paramedic who arrived at the scene at approximately 1:32 p.m. (Doc. 14, Ex. B, Vol. II at 54-55, 58-60).  Mr. Chimiengo stated that after he placed Petitioner in the ambulance, he asked Petitioner about the shooting, and Petitioner stated he shot his wife because she divorced him (*id.* at 58).  Mr. Chimiengo also testified that he did not detect any odor of alcohol from Petitioner, and Petitioner appeared to be alert and oriented such that he was able to converse (*id.* at 58-60).

(9)  Testimony from James Merrill, an investigator with the Panama City Beach Police Department, that when he arrived at the scene of the shooting, Petitioner's vehicle was "very" properly parked in a parking space in the parking lot, in that it was parked well within the lines of the parking space (Doc. 14, Ex. B, Vol. III at 48, 53).

(10)  Petitioner's statement to police on March 25, 1998, six days after the shooting (Doc. 14, Ex. B, Vol. III at 21-44).  Petitioner said he remembered seeing the victim at the credit union, and he remembered shooting himself, but he did not remember shooting her (*id*. at 31-32).  Petitioner said he had never owned a gun prior to purchasing the gun he used in the shooting (*id*. at 32).  He said he had consumed "quite a bit" of alcohol that day (*id*. at 34).  Petitioner said he planned

to go the credit union and shoot his ex-wife and himself (*id*. at 35, 40). He said he had become aggravated because his ex-wife threw him out of the house two weeks prior (*id*.).

(11) Petitioner's testimony during trial that when he bought the gun from the pawn shop, he rationalized that he needed it for protection, but he "knew what [he] was going to do" with it and thought he would kill himself (Doc. 14, Ex. B, Vol. III at 119-20). Petitioner testified that on the morning of the shooting, he took the gun out of Ms. Ranier's house and lied to her by telling her that he sold it to Mr. Bacia, but he did not (*id*. at 123, 132). When asked by defense counsel if he "had it in [his] mind" to go to the credit union and shoot his ex-wife, Petitioner responded in the negative (*id*. at 125). Defense counsel then asked Petitioner if he "had it in [his] mind" that he was going to shoot himself in front of his ex-wife, Petitioner responded, "I, I think that's what it was, you know, I was gonna shoot myself in front of her" (*id*.). On cross-examination, Petitioner testified that he remembered telephoning his ex-wife prior to 1:15 p.m. to meet him at the credit union, and he knew that the gun was in his truck (*id*. at 132). He testified that he remembered loading the gun, but he did not remember placing the gun in the box during the ride to the credit union (*id*. at 132-33, 137). He also testified that he remembered seeing his ex-wife exit her car, but he did not remember exiting his truck, taking the gun out of the box, or shooting her (*id*. at 137-38). Later during cross-examination, Petitioner testified that he did not remember anything after he got in his truck to go to the credit union (*id*. at 150). In response, the prosecutor questioned Petitioner about his earlier testimony that he saw his ex-wife get out of her car, and Petitioner responded:

> Well, I, I'm trying to remember everything, you know, but, you know, like, because I know that they've already presented the case, okay, and, and they tell me what, what happened, okay, and I'm trying to make this thing, you know, where I can justify it in my mind, what I've done, okay, but with, with these pieces that people's telling me, that Kae walked over to the, to the car, like, because that witness we had the other day, she said that she seen [sic] Kae walking, okay, so I assumed she seen Kae walking.

(*id*.).

This court must weigh this evidence of guilt against the available evidence of Petitioner's intoxication. The following evidence of Petitioner's intoxication on the day of the murder was presented at trial:

(1)   Testimony from James Merrill, the investigator with the Panama City Beach Police Department, that a partially full bottle of Canadian Mist was found stuck down between the seats of Petitioner's vehicle (Doc. 14, Ex. B, Vol. III at 56-57, 63-64).  Mr. Merrill stated that during an interview with police on March 25, 1998, Petitioner stated he consumed beer in the parking lot of the credit union; however, no beer cans were found in the area of the shooting (*id*. at 64-65).

(2)   Petitioner's testimony that when he left Ms. Ranier's house on the morning of the shooting (according to Ms. Ranier's testimony, it was approximately 11:00 a.m.), he first stopped at Outback, bought a half pint of liquor, and drank it (Doc. 14, Ex. B, Vol. III at 122).  He then bought another half pint at the Carousel and drank it (*id.* at 122-23).  He went to the White Caps bar and drank beer, and then stopped at the Carousel again and bought another half pint (*id*. at 121-23, 130-31).  Petitioner testified he was "pretty drunk" by the time he arrived at the credit union (*id*. at 122).

(3) Petitioner's medical records from the day of the shooting that indicated his blood/alcohol level was .15 one hour after the shooting (Doc. 14, Ex. B, Vol. IV. at 16-23).

In addition to the evidence presented at trial, Petitioner alleges that the following evidence of his intoxication was available:  (1) the testimony of Ms. Love and Mr. Vann, (2) records documenting his treatment for alcohol abuse in 1993 and 1996, and (3) expert testimony regarding the effect of Petitioner's history of alcoholism and alcohol consumption on his mental state on the day of the murder (Doc. 6 at 4, 7-13).

With regard to the testimony of Ms. Love and Mr. Vann, Petitioner does not allege that either Ms. Love or Mr. Vann was available to testify at trial.  Indeed, at the post-conviction evidentiary hearing, Attorney Smith testified that Ms. Love was not available (*see* Doc. 14, Ex. I at 247). Attorney Smith also testified that he attempted to locate Mr. Vann, but was unsuccessful because Petitioner provided him with the wrong name (*id*. at 247-48).  Smith testified that after Petitioner's trial, he realized Petitioner had given him the wrong name, because a man named Jovaugh Nicholet became a regular client of the Public Defender's Office, and Smith realized that he (Nicholet) was probably the man to whom Petitioner was referring (*id*.).  Furthermore, Petitioner has offered nothing but his own speculation as to the substance of Ms. Love's and "Mr. Vann's" testimony. Although he asserts that they would have testified that during the two-week period prior to the

murder, they observed Petitioner drinking excessively, he provided no factual support for this assertion.  Therefore, Petitioner has failed to demonstrate that this evidence was available for presentation at trial.

Likewise, Petitioner has failed to demonstrate that expert testimony regarding his mental state on the day of the shooting was available.  Petitioner contends that defense counsel should have conducted further investigation and consulted with an expert to discover evidence of: (1) the extent of Petitioner's liver damage, (2) the amount of alcohol that a person in Petitioner's physical condition would have had to consume to register a blood/alcohol level of .15 one hour after the shooting, and (3) the level of impairment of Petitioner's mental state that the consumption of that amount of alcohol would have caused (Doc. 16 at 12-13).  However, Petitioner has offered nothing to show that even with this information, Dr. Gilgun or any other expert would have testified that a person in Petitioner's condition who had consumed the amount of alcohol he would have had to consume to register a .15 one hour after the shooting would have been unable to premeditate the murder.  Petitioner's having failed to show that such expert testimony was available, the court cannot consider it in the prejudice analysis of re-weighing the evidence of guilt against the totality of available evidence to support a voluntary intoxication defense.

With regard to the documentary evidence of Petitioner's treatment for alcohol abuse, Petitioner has demonstrated that defense counsel had the records of his treatment in 1993 and 1996, or those records were available, as counsel testified to this at the Rule 3.850 hearing.  However, the record also establishes that defense counsel presented the fact of Petitioner's treatment in 1993 and 1996 through Petitioner's own testimony.  Furthermore, the prosecutor did not cross-examine Petitioner on this issue or otherwise undermine his testimony regarding the fact of his treatment. Thus, the records had little or no corroborative value, as the issue was not dispute.  Therefore, Petitioner failed to establish that counsel's performance was deficient.

Additionally, in re-weighing the evidence of guilt and the available evidence regarding Petitioner's intoxication on the day of the shooting, specifically, the evidence presented at trial and the available treatment records, this court concludes that there is no reasonable probability that if defense counsel had presented the treatment records to the jury, the jury would have had reasonable doubt as to Petitioner's guilt.  Therefore, the state court decision denying Petitioner's claims was

not contrary to or an unreasonable application of <u>Strickland</u>, nor was it based upon an unreasonable determination of the facts.  Accordingly, Petitioner is not entitled to federal habeas relief on Grounds One and Two.

>    B.    Ground three:  Ineffective assistance of trial counsel

Petitioner claims that his trial counsel performed deficiently by failing to seek pre-trial suppression of Petitioner's statement to law enforcement on the grounds that the waiver of his <u>Miranda</u> rights was not knowing and intelligent and his confession was invalid (Doc. 6 at 5, 13, supporting memorandum at 7-11).  Petitioner contends that when police interrogator Jim Cauley inquired of hospital staff whether Petitioner's condition rendered him capable of being interrogated, Cauley was told that Petitioner was not in a condition to be questioned, and that only Petitioner's doctor could approve an interrogation (Doc. 16 at 18).  Petitioner states that Cauley interrogated him in the absence of any indication that Petitioner's doctor was consulted (*id*.).  Additionally, Petitioner contends that a visitor who was in Petitioner's room when Mr. Cauley arrived to interrogate Petitioner described that Petitioner "had no idea what was going on" both before and after the interrogation (*id*.).

The record shows that during trial, Petitioner's counsel sought exclusion of Petitioner's statement to police on the ground that his physical and mental condition rendered him incapable of knowingly and voluntarily providing a statement (Doc. 14, Ex. B, Vol. III at 3-9).  Defense counsel proffered Petitioner's medical records which showed the medications Petitioner was taking at the time of the interrogation, as well as notes from hospital personnel regarding Petitioner's condition (*id*.).  Petitioner's counsel argued that the medical records and the transcript of the interrogation established that Petitioner was incapable of knowingly and intelligently providing a statement to police (*id*.).

Assuming arguendo that defense counsel's failure to present testimony from Petitioner's doctor and Odie Ranier, Petitioner's friend who was present immediately before and after the interrogation, constituted deficient performance, Petitioner failed to establish a reasonable probability that the outcome of his trial would have been different but for counsel's error.  Although Petitioner suggests that counsel should have presented testimony from Petitioner's doctor, Petitioner failed to proffer, at the state post-conviction hearing or in this proceeding, any evidence in the form

of an affidavit or otherwise that Petitioner's doctor would have testified that Plaintiff's physical and psychological condition was such that he was unable to knowingly and voluntarily provide a statement to police or waive his <u>Miranda</u> rights.  Additionally, although Petitioner alleges that the police officers who interrogated him testified falsely that medical personnel had told them that Petitioner was capable of being interviewed, Petitioner failed to provide any factual support for his allegation.  Likewise, Petitioner failed to proffer in this court or the state courts any evidence of coercive conduct on the part of police.

Moreover, the trial record contains other direct evidence that Petitioner premeditated the murder.  Mr. Chimiengo, the paramedic, testified that Petitioner told him that he shot his ex-wife because she divorced him.  Petitioner does not allege that this testimony was erroneously admitted at trial, either because of deficient performance by counsel or trial court error.  Thus, Petitioner has failed to establish a reasonable probability that absent his statement to police, the jury would have had reasonable doubt that prior to the shooting he consciously decided to shoot his ex-wife.[6] Accordingly, Petitioner has failed to establish that the state court decision denying his claim was based upon an unreasonable determination of the facts, or that it was contrary to or an unreasonable application of <u>Strickland</u>.

      C.    <u>Ground four:  Ineffective assistance of trial counsel.</u>

Petitioner claims that he received ineffective assistance of counsel because his trial counsel advised him to waive his right to a 12-person jury in exchange for the State's agreement not to seek the death penalty (Doc. 6 at 5).  Petitioner states that one week prior to trial, counsel advised him that the State was willing to waive its right to seek the death penalty if Petitioner would waive his right to a 12-person jury (*id*. at 18).  Counsel advised Petitioner that he (counsel) preferred a 6-

---

[6]The record also contains circumstantial evidence of premeditation, including:  Mr. Bacia's testimony that Petitioner stated he would kill the victim if she ever tried to get the house; Ms. Malki's testimony that Petitioner purchased the gun one week prior to the shooting and took possession of it the day before the shooting; Petitioner's testimony that he had not previously owned a gun; Gregory George's testimony that the night before the shooting, Petitioner expressed frustration with his financial situation because he felt he had no control over his funds, and he related this lack of control to his ex-wife; Petitioner's testimony that although he did not remember placing the gun in the box that he intended to give to his ex-wife, he remembered placing the gun in his truck and could not explain how it got into the box; Mr. Collins' testimony that when he spoke to Petitioner between 1:00 and 1:20 on the afternoon of the shooting, Petitioner was friendly, but Petitioner's demeanor had changed when Petitioner called again at 1:20; and Ms. Diep's testimony that when Petitioner met the victim, he pulled the gun out of the box very quickly and shot the victim in the head, and then immediately shot himself.

person jury, and recommended that Petitioner execute the written waiver to avoid the possibility of receiving the death penalty (*id*.).  Based upon counsel's advice, Petitioner signed the written waiver (*id*. at 18-19).  Petitioner contends that counsel's advice was deficient in three regards:  (1) counsel failed to inform him that he (counsel) did not believe that the case qualified for the death penalty, (2) counsel failed to advise him that the State would "have a higher burden" of convincing 12 persons, as opposed to 6 persons, of Petitioner's guilt, and (3) counsel failed to advise him that there is "a significantly greater chance" of a hung jury with a 12-person jury (*id*. at 19).

Petitioner has again failed to show he was prejudiced by counsel's alleged error.  Initially, Petitioner does not allege that he would not have signed the waiver if counsel's advice had included the three areas that Petitioner identified as lacking.  Additionally, the record is devoid of evidence that shows there is a reasonable probability that an acquittal or hung jury would have resulted had Petitioner's counsel insisted on a jury of twelve.  Furthermore, an evidentiary hearing on the prejudice issue would not be productive.  To satisfy the prejudice prong of <u>Strickland</u>, Petitioner would need to recreate the courtroom scene that existed in his case on November 9, 1998, the day the process of selecting the jury began, and then somehow establish that a jury of twelve selected from the venire then present would have either acquitted him or hung.  *See* <u>Cabberiza v. Moore</u>, 217 F.3d 1329, 1334 (11th Cir. 2000).  As the Eleventh Circuit noted in <u>Cabberiza</u>, ". . . proceeding in such a manner is out of the question."  *Id.*  To the extent that Petitioner requests that the court adopt a per se rule that a defendant is always prejudiced when his counsel stipulates to six jurors instead of twelve, or suggests that the court take judicial notice that a jury of twelve is always better for a defendant than a jury of six, the Eleventh Circuit has rejected these arguments.  *Id.*  at 1334-36.  As Petitioner failed to satisfy the prejudice prong of the <u>Strickland</u> standard, he has failed to establish that the state court decision was contrary to or an unreasonable application of <u>Strickland</u>, or based upon an unreasonable determination of the facts.  Accordingly, he is not entitled to relief on this claim.

      D.     <u>Ground five:  Ineffective assistance of trial counsel</u>.

Petitioner claims that his trial counsel performed deficiently by failing to adequately object to the State's questioning of defense witness Don Bramblett on the issue of Petitioner's training as a Navy Seal (Doc. 6 at 5a).  Petitioner contends counsel should have objected on the grounds that

the questioning was highly prejudicial and beyond the scope of direct examination, and moved for a mistrial or to strike the objectionable testimony (*id.* at 5a, 23).

The record shows that during direct examination, defense counsel elicited testimony from Mr. Bramblett that he met Petitioner a few days prior to the murder during a meeting with Greg George (Doc. 14, Ex. B, Vol. IV at 5-6, 11). Mr. Bramblett testified that he and Petitioner discussed their experiences in the Navy (*id.* at 8). Defense counsel asked Mr. Bramblett if he knew that Petitioner had a gun, and Bramblett responded in the affirmative (*id.* at 9).

During cross-examination, the prosecutor asked Mr. Bramblett specific questions about his conversation with Petitioner about their Navy experiences, for example, whether Petitioner told him he had been a Navy Seal in Vietnam and used a pistol and a .50 caliber rifle in Vietnam, and Bramblett responded in the affirmative (*id.* at 12-13). The prosecutor then questioned Bramblett as follows:

Q.    Have you ever been trained in the use of deadly force as a, was it a master chief?

A.    Senior Chief.

Q.    Have you ever gone through that training?

A.    Um, pistols and riffle [sic].

Q.    What training does the Navy give to everybody in the use of pistols and riffles [sic] as far as deadly force, tell us a little bit about that?

A.    Okay, it starts in boot camp. Everyone learns how to tear down a 45, put it back together, and gets to shoot a couple of rounds, three or four rounds.

Q.    Okay, a 45 is an automatic, right?

A.    Semi-automatic.

Q.    Okay. I want to show you what has been introduced as State's 6, and I know you can't identify this, but is that the same type of weapon, what I mean type, I mean, automatic as a .45 you all used in the Navy?

A.    Yes.

>    Q.    Are Navy recruits trained if you shoot somebody in the head, that's
> more or less an area, if you shoot them there that's gonna kill them?

(*id*. at 13-14).  Defense counsel objected to the question on the ground that it went beyond the scope of direct examination, and the trial court sustained the objection (*id*. at 14).

The jury was already aware of the fact, through Petitioner's own testimony, that Petitioner had been a Navy Seal in Vietnam, he had killed in the line of duty, and his training and experience taught him that if he shot someone in the head, it would kill the person (Doc. 14, Ex. B, Vol. III at 129-30).  In light of Petitioner's testimony on this subject, he has failed to show a reasonable probability that the result of the trial would have been different if the jury had not heard Mr. Bramblett's testimony that all Navy recruits are trained how to assemble and shoot the type of weapon that Petitioner used in the murder.  Therefore, he has failed to establish that the state court decision was contrary to or an unreasonable application of <u>Strickland</u>, or based upon an unreasonable determination of the facts.  Accordingly, he is not entitled to relief on this claim.

   E.    <u>Ground six:  Ineffective assistance of trial counsel</u>.

Petitioner next claims he received ineffective assistance of counsel on the ground that counsel failed to object to or seek to exclude the testimony of Bill Lewis (Doc. 6 at 5a, 22-23).  Petitioner argues that his counsel should have objected to Mr. Lewis' testimony on the following grounds:  (1) the State did not disclose Mr. Lewis as a witness during discovery, (2) Mr. Lewis' testimony was impermissible under Florida Statutes section 90.701 because he was not tendered as an expert, yet he testified to matters requiring special knowledge, skill, experience or training, and (3) Mr. Lewis' testimony was inadmissible under Florida Statutes section 90.701 because he had no personal knowledge of whether Petitioner was impaired by alcohol at the time of the murder (*id*. at 22-23).[7]  Petitioner states that there is a reasonable probability that the trial court would have

---

[7]Florida Statutes section 90.701 provides:

If a witness is not testifying as an expert, the witness's testimony about what he or she perceived may be in the form of inference and opinion when:

(1) The witness cannot readily, and with equal accuracy and adequacy, communicate what he or she has perceived to the trier of fact without testifying in terms of inferences or opinions and the witness's use of inferences or opinions will not mislead the trier of fact to the prejudice of the objecting party; and

sustained counsel's objection and disallowed Mr. Lewis' testimony, and that the outcome of the trial would have been different if the jury had not heard Mr. Lewis' testimony (*id*. at 25).

At Petitioner's trial, the issue of Mr. Lewis' testimony arose when defense counsel sought to introduce Petitioner's medical records, which showed that Petitioner's blood/alcohol level was .15 upon his arrival at the hospital one hour after the shooting (*see* Doc. 14, Ex. B, Vol. III at 4-5, Vol. IV at 16). The defense had also requested a jury instruction on the presumption under Florida law that a person with a blood/alcohol level of .08 is under the influence of alcohol to the extent that his normal faculties are impaired. The prosecutor objected to introduction of the medical records on the ground that the defense had not disclosed the medical records during discovery, and the records contained hearsay (*id*., Vol. III at 6-7, 11-12, Vol. IV at 16-17). The prosecutor argued that if the defense had disclosed the medical records during discovery, the State would have subpoenaed an expert to assist the jury in understanding the records (*id*., Vol. III at 11-12, Vol. IV at 18). The prosecutor stated that he became aware of defense counsel's intention to introduce the medical records during a discussion with defense counsel the night before trial, and intended to proffer the testimony of Mr. Lewis as a rebuttal witness.

The prosecutor proffered testimony from Mr. Lewis outside the presence of the jury (*id*., Vol. IV at 18-19, 25-28). Defense counsel objected to the proffered testimony on several grounds (*id*. at 27-38). The trial court overruled some objections and sustained others (*id*.). In the end, Mr. Lewis was permitted to testify as follows:

> Q.     Okay. In your experience are persons who are alcoholics better able to tolerate their alcohol than persons who are not alcoholics? What I mean by that is are persons who are alcoholics less likely to manifest observable signs of impairment or intoxication?
>
> A.     As a general rule that's true, yes.
>
> Q.     Okay. And in your experience as a law enforcement officer, as a prosecutor, is it, is the quantity of alcohol that one would need to consume greater to reach a state of intoxication than it would be to simply become impaired from alcohol?

---

(2) The opinions and inferences do not require a special knowledge, skill, experience, or training.

Case No:  5:03cv280/SPM/EMT

A.      Yes, sir.

(*id*. at 44-45).  During the proffer, defense counsel had objected to Mr. Lewis' testimony that alcoholics are less likely to manifest observable signs of impairment or intoxication that non-alcoholics, on the ground that the question invaded the province of the jury because Mr. Lewis was testifying as an expert about matters that the jury could decide based upon their experience as lay persons (*id*. at 35-37).  The trial court overruled the objection (*id*. at 36).  Defense counsel did not object to Mr. Lewis' testimony that the quantity of alcohol that a person would need to consume to reach a state of intoxication is greater than the quantity that a person would need to become impaired (*id*. at 38).

Petitioner failed to demonstrate that Attorney Smith's performance with regard to objecting to Mr. Lewis' testimony was deficient.  Initially, Petitioner's assertion that Attorney Smith should have objected to Mr. Lewis' testimony on the ground that the State failed to disclose him as a witness during discovery is without merit.  The trial transcript shows that the State did not previously supply Mr. Lewis' name to defense counsel because the State had not intended to call him as a witness until after the trial began, in response to defense counsel's revelation that he intended to introduce medical records which the defense failed to previously disclose to the State (Doc. 14, Ex. B. Vol. IV at 16-19).  Indeed, Attorney Smith admitted during the evidentiary hearing on Petitioner's Rule 3.850 motion that he had not provided the medical records to the State prior to trial (*see* Doc. 14, Ex. I at 223).  Thus, the State had a valid excuse for not previously providing Mr. Lewis' name to the defense.  In light of the State's valid excuse, the only benefit to an objection by counsel would have been a recess to provide counsel an opportunity to prepare for cross-examination.  However, defense counsel was given the opportunity to conduct a voir dire examination of Mr. Lewis during the State's proffer, and Petitioner has failed to show that more preparation time would have made a difference in defense counsel's cross-examination at trial.  Therefore, Petitioner failed to establish that counsel performed deficiently by failing to object to Mr. Lewis' testimony on the ground that the State failed to previously disclose him as a witness.

Additionally, Petitioner's assertion that Attorney Smith should have objected to Mr. Lewis' testimony on the ground that Mr. Lewis testified to matters requiring special knowledge, experience or training, but the State failed to tender him as an expert, is based on the false premise that the State

did not tender him as an expert.  The record demonstrates that the State <u>did</u> proffer Mr. Lewis as an expert witness based upon his experience and training as a prosecutor and a law enforcement officer (Doc. 14, Ex. B, Vol. IV at 26-38).  Defense counsel objected to Mr. Lewis' testimony that experienced drinkers can tolerate more alcohol than inexperienced drinkers, on the ground that such an opinion was in the knowledge and experience of lay persons and was not the proper subject of expert testimony (*id*. at 35-37).  The trial court overruled the objection (*id*.).  Defense counsel also objected to Mr. Lewis' testimony that it takes a greater quantity of alcohol to become intoxicated, as opposed to impaired, to the extent that Mr. Lewis was referring to legal standards of impairment and intoxication (*id*. at 38).  The trial court sustained the objection, but inquired whether defense counsel objected to the testimony without reference to the legal standards (*id*.).  The record shows defense counsel considered the modified testimony and decided not to object (*id*.).  Petitioner has failed to show that defense counsel's failure to object to the modified testimony was unreasonable or otherwise a decision that no competent counsel would have made.  Thus, Petitioner failed to demonstrate that defense counsel performed deficiently by failing to make such an objection.

Petitioner's contention that defense counsel should have objected to Mr. Lewis' testimony on the ground that Mr. Lewis had no personal knowledge of whether Petitioner was impaired by alcohol at the time of the murder is also without merit.  The State did not offer Mr. Lewis' testimony as based upon personal knowledge of Petitioner's mental condition at the time of the shooting.  The State proffered Mr. Lewis' opinion as expert testimony based upon his special knowledge, experience, and training as a law enforcement officer and a prosecutor.  After defense counsel objected to several areas of inquiry by the State, the trial court determined that Mr. Lewis' testimony was the proper subject of expert testimony and that Mr. Lewis qualified as an expert (*see* Doc. 14, Ex. B, Vol. IV at 35, 38, 44-45).  As Mr. Lewis was testifying as an expert, an objection on the ground that he had no personal knowledge of Petitioner's mental condition at the time of the shooting and thus could not provide a lay opinion pursuant to section 90.701 would have been meritless.

In sum, Petitioner has failed to show that the state court decision denying this claim was based upon an unreasonable determination of the facts, or was contrary to or an unreasonable application of <u>Strickland</u>.  Therefore, he is not entitled to federal habeas relief.

F.      Ground seven:  Ineffective assistance of trial counsel.

Petitioner next claims he received ineffective assistance of counsel because Attorney Smith failed to object to the testimony of Ruthie Clieland on the following grounds:  (1) the State failed to disclose Ms. Clieland during discovery, and (2) Ms. Clieland's testimony was inadmissible because she lacked personal knowledge of the status of Petitioner's claim in the victim's probate case and lacked knowledge of other activity in the case (Doc. 6 at 5a - 5b, 26-27).

Initially, the record directly refutes Petitioner's contention that Attorney Smith failed to object to Ms. Clieland's testimony on the ground that the State failed to disclose her.  The trial transcript shows that counsel made that objection, and the trial court overruled it (Doc. 14, Ex. B, Vol. IV. at 52-57, 60).  Thus, counsel did not perform deficiently in this regard.

Additionally, the record demonstrates that Ms. Clieland's testimony proved she had personal knowledge of the matters to which she testified.  During the State's proffer of Ms. Clieland's testimony, she testified that she was the co-personal representative of the victim's estate (Doc. 14, Ex. B, Vol. IV at 53).  She stated that a claim was filed on Petitioner's behalf against the estate for a piece of property in Virginia Beach (id. at 53-54).  The trial court reviewed the records of the victim's probate case and observed that a claim to property in Virginia Beach had been filed on Petitioner's behalf (id. at 55, 59-60).  This evidence was sufficient to support a finding under Florida Statutes section 90.604 that Ms. Clieland had personal knowledge of the probate case.[8]  The fact that Ms. Clieland testified that she lacked knowledge of other facts relating to the probate case and the Virginia Beach property bore on her credibility, but it did not render her testimony inadmissible. See United States v. Scheffer, 523 U.S. 303, 313, 118 S.Ct. 1261, 1266, 140 L.Ed.2d 413 (1998) ("Determining the weight and credibility of witness testimony . . . has long been held to be the part of every case that belongs to the jury . . .").  As Petitioner failed to show that counsel had a meritorious basis for objecting to the admissibility of Ms. Clieland's testimony on the ground of lack

---

[8]Florida Statutes section 90.604 provides:

Except as otherwise provided in s. 90.702 [the statutory section pertaining to testimony by experts], a witness may not testify to a matter unless evidence is introduced which is sufficient to support a finding that the witness has personal knowledge of the matter.  Evidence to prove personal knowledge may be given by the witness's own testimony.

of personal knowledge, counsel's failure to lodge such an objection did not constitute deficient performance.

       G.     Ground eight:  Newly discovered evidence.

      Petitioner claims that after his trial, he discovered evidence to rebut the State's evidence that the murder was motivated by his desire for financial gain (Doc. 6 at 5b, 28-30).  He asserts that this newly discovered evidence was evidence that the claim filed on his behalf in the victim's probate case had been disallowed by the probate court (*id.* at 29).

      Initially, Petitioner concedes that he failed to exhaust this claim in the state courts (Doc. 16 at 34).  However, even if the claim was exhausted, it is not cognizable on federal habeas review. Under federal habeas corpus review, claims based upon newly discovered evidence are insufficient unless the evidence implicates an independent constitutional violation that occurred during the state criminal proceeding.  Herrera v. Collins, 506 U.S. 390, 400, 113 S.Ct. 853, 860, 122 L.Ed.2d 203 (1993); Townsend v. Sain, 372 U.S. 293, 317, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963), *overruled on other grounds*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992).  Newly discovered evidence which bears only upon the guilt or innocence of the petitioner does not justify habeas corpus relief. Townsend, 372 U.S. at 317; Swindle v. Davis, 846 F.2d 706, 707 (11th Cir. 1988).  "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution -- not to correct errors of fact."  Herrera, 506 U.S. at 400-01.

      Of particular relevance to the case at bar is Swindle, wherein the petitioner, who was convicted at trial of manslaughter, claimed in a federal habeas petition that new evidence showed that the victim was not killed by him but by another individual who was later involved in an altercation with the victim.  Upon review of the district court's decision, the Eleventh Circuit found that this new evidence implicated only the petitioner's guilt or innocence. 846 F.2d at 707.  Because the petitioner did not claim that the state withheld this evidence or purposefully solicited false evidence at trial, the court found no unconstitutional infirmity in the trial and therefore denied the claim of newly discovered evidence without further review.  *Id.*

      In the instant case, Petitioner's newly discovered evidence consists of documents showing that his claim against the victim's estate was disallowed.  Even if this court accepted Petitioner's

contention that this evidence was relevant to the question of his guilt or innocence,[9] Petitioner does not allege that the new evidence implicates an independent constitutional violation that occurred during his trial.  Accordingly, his claim of newly discovered evidence is not cognizable on federal habeas review.

       H.      <u>Grounds nine and ten:  Denial of right of confrontation</u>.

       Petitioner claims that the trial court violated the Confrontation Clause by preventing defense counsel from cross-examining Maro Malki on the issues of whether Petitioner had prior convictions and whether he had domestic violence injunctions against him (Doc. 6 at 5b-5c).  Petitioner contends this evidence was relevant to show his good character and to counter the testimony that Petitioner was a Navy Seal trained in the use of guns and deadly force (*id*. at 30-33).

       1.      Clearly Established Supreme Court Law

       "In all prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  A primary interest secured by the Confrontation Clause is the opportunity for cross-examination.  *See* <u>Olden v. Kentucky</u>, 488 U.S. 227, 231, 109 S.Ct. 480, 483, 102 L.Ed.2d 513 (1988); <u>Davis v. Alaska</u>, 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974); <u>Kentucky v. Stincer</u>, 482 U.S. 730, 736, 107 S.Ct. 2658, 2662, 96 L.Ed.2d 631 (1987); <u>United States v. Williams</u>, 837 F.2d 1009, 1015 (11th Cir.), *cert. denied*, 488 U.S. 965, 109 S.Ct. 490, 102 L.Ed.2d 527 (1988).  "Exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination."  <u>Davis</u>, 415 U.S. at 316-17 (citing <u>Greene v. McElroy</u>, 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959)).

       The defendant's right to cross-examine witnesses is not without limitation, however.  He is only entitled to an opportunity for effective cross-examination, not cross-examination "in whatever way, and to whatever extent, the defense might wish."  <u>Delaware v. Fensterer</u>, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (per curiam).  The Confrontation Clause is not violated by a trial court's imposition of restrictions based upon concerns of prejudice and confusion of the issues.  <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); <u>United</u>

---

    [9]Petitioner contends the evidence rebuts the State's evidence that he murdered his ex-wife for financial gain.  However, the fact that Petitioner's probate claim was disallowed does not refute the fact that he filed it, nor does it otherwise discredit the State's theory that the murder was motivated by Petitioner's desire for financial gain.  The fact that Petitioner filed the claim indicated his desire for financial gain; the actual outcome of the claim is irrelevant.

States v. Bennett, 928 F.2d 1548 (11ᵗʰ Cir. 1991); Francis v. Dugger, 908 F.2d 696 ( 11ᵗʰ Cir. 1990), *cert. denied*, 111 S.Ct. 1696, 114 L.Ed.2d 90 (1991).  Cross-examination is constitutionally adequate as long as a defendant is permitted to elicit sufficient information from which (1) the jury can gauge credibility, motive and bias and (2) his counsel is able to argue to the jury how the witness might have been biased.  United States v. Van Dorn, 925 F.2d 1331, 1335 (11ᵗʰ Cir. 1991); United States v. Sellers, 906 F.2d 597, 602 (11ᵗʰ Cir. 1990); Bundy v. Dugger, 850 F.2d 1402 (11ᵗʰ Cir. 1988), *cert. denied*, 488 U.S. 1034, 109 S.Ct. 849, 102 L.Ed.2d 980 (1989).

Should the trial court's limitation of cross-examination constitute error, such error may be harmless depending upon the importance of the witness' testimony, whether the testimony would be cumulative, the extent of cross- examination permitted, the introduction of corroborating evidence or the lack thereof, and the strength of the state's case establishing the defendant's guilt. Van Arsdall, 475 U.S. at 684.

2.      Federal Review of State Court Decision

Petitioner raised both Confrontation Clause claims in the direct appeal of his conviction.  The First DCA affirmed the conviction per curiam.  Although the state court denial of Petitioner's claim without opinion provides no guidance to this court in determining the rationale for its decision, this court must still defer to the state court decision unless review of the record shows that decision to be unreasonable.  *See* Helton v. Secretary for Dept. of Corrections, 233 F.3d 1322, 1326-27 (11ᵗʰ Cir. 2000); Delgado v. Lewis, 223 F.3d 976, 982 (9ᵗʰ Cir. 2000); Hannon v. Cooper, 109 F.3d 330, 335 (7ᵗʰ Cir. 1997).

Based upon the evidence in the record, it does not appear to have been necessary to the defense that the pawn shop employee be questioned about whether the processing of Petitioner's application to purchase the gun revealed that he was not a convicted felon and did not have any domestic violence injunctions against him.  The focus of the defense was that there was insufficient evidence that Petitioner premeditated the murder.  The State introduced evidence, through Ms. Malki's testimony, that Petitioner purchased a gun at a pawn shop one week prior to the murder. The prosecutor questioned Ms. Malki about the process for obtaining a weapon in the State of Florida, and Ms. Malki responded that the process involved completing an application and contacting the State law enforcement agency to conduct a "records' check" (Doc. 14, Ex. B, Vol.

II at 62-63).   The prosecutor then inquired whether Ms. Malki observed any indication that Petitioner was under the influence of alcohol at the time he applied to purchase the gun, and she responded in the negative (*id*. at 64-66).

On cross-examination, the defense attempted to adduce testimony from Ms. Malki that Petitioner was not a convicted felon, nor did he have any record of domestic violence injunctions entered against him.   Defense counsel asked Ms. Malki if convicted felons may purchase firearms, and Ms. Malki responded, "No." (Doc. 14, Ex. B, Vol. II at 68).   Although the prosecutor objected, and the court instructed defense counsel at sidebar that the fact that Petitioner was not a convicted felon and had not had a domestic violence injunction entered against him was irrelevant, Ms. Malki's testimony was not stricken, nor the was jury instructed to disregard it (*id*. at 68-69).   Thus, defense counsel was able to present the fact of Petitioner's lack of prior felony convictions to the jury.   The trial court limited defense counsel's questioning regarding domestic violence, finding that such evidence was irrelevant (Doc. 14, Ex. B, Vol. II at 68-69).   Petitioner contends the evidence was relevant to show that he bore no grudge against the victim, he had no prior violent confrontations with her, and he had "generally good character" (*see* Doc. 6 at 30, 32).   However, the trial court's ruling was correct.   The lack of prior reported domestic violence between Petitioner and the victim would not establish that Petitioner bore no grudge against her, nor would it negate the element of premeditation.   Furthermore, the State offered no evidence indicating that there had been violent confrontations between Petitioner and the victim.   Moreover, the testimony would not have exposed the jury to facts helpful to evaluate Ms. Malki's credibility or to enable defense counsel to establish a record from which he could argue that the witness was less than credible.   Even if the trial court erred in finding the evidence irrelevant, the error was harmless.   Mr. Bacia, Petitioner's former next door neighbor, testified that he knew of no violence between Petitioner and his ex-wife, and "never heard any hollering, no screaming, no breaking dishes, nothing . . . she was just as kind to him as he was to her . . ." (Doc. 14, Ex. B, Vol. II at 76).   Another neighbor, who lived across the street from Petitioner and the victim, testified that she never witnessed any discord, fighting, or anything else of that nature (*id.*, Vol. IV at 3-4).   Therefore, the trial court's exclusion of this testimony did not violate Petitioner's Sixth Amendment right.   Because the state appellate court's

denial of this claim did not represent an unreasonable application of Supreme Court law, federal habeas relief should be denied.

      I.      <u>Ground eleven:  Denial of right of confrontation.</u>

      Petitioner additionally claims that the trial court denied his right to confront witnesses by refusing to allow testimony from Ms. Malki that Odie Ranier called the pawn shop and requested that they not to sell a gun to Petitioner because he was threatening to commit suicide (Doc. 6 at 5c). Petitioner argues the testimony was relevant to show that he was suffering from diminished mental capacity and that he purchased the gun with the intention of killing himself, not his ex-wife (*id*. at 33-34; Doc. 16 at 39).  Additionally, the testimony would have bolstered the subsequent testimony of Ms. Ranier that she called the pawn shop and requested that they not sell Petitioner the gun (Doc. 16 at 39-40).

      As with Petitioner's prior claims of Confrontation Clause violations, he raised this claim in the direct appeal of his conviction, and the First DCA affirmed the conviction per curiam

      The relevant portion of the trial transcript follows:

            BY MR. SMITH:

            Q.     The 18th is the day he actually came in and got the gun, right?

            A. [Ms. Malki]  Yes, sir.

            Q.     And did you receive a phone call from somebody after he picked up the gun?

            A.     No, I don't recall.

            Q.     Did a lady call you and tell you not to sell him a gun?

            MR. DINGUS:        Objection as to hearsay.

            THE WITNESS:     I don't --

            THE COURT:        Okay, wait just a minute, let me ask you all to come back.

            (Side-bar conference:)

            THE COURT:        What are you trying to do?

MR. SMITH:           Just that she called her, said in her statement she talked all about it, that they carried --

THE COURT:           Why isn't it hearsay?

MR. SMITH:           It's not offered to prove the truth of the matter.

THE COURT:           What is it offered for?

MR. SMITH:           Just to show somebody called, was concerned about him buying a gun.

MR. DINGUS:          That's truth of the matter asserted.

THE COURT:           I don't think that's an issue here frankly as to whether somebody called.  I mean, what –

MR. SMITH:           The witness will testify to that, I am just trying to verify that, in fact, she got a phone call from her.

THE COURT:           She said she didn't remember so.

MR. SMITH:           It's in her statement though.

THE COURT:           I understand but it's not relevant anyway.  It certainly is hearsay if you ask if somebody called.  Still don't see what you are trying to prove by it.

MR. SMITH:           Well, it goes to --

THE COURT:           To what?

MR. SMITH:           Miss Ranier's testifying later and said, yeah, she called down because she was afraid he was going to kill himself.

THE COURT:           Her fears are not an issue either.

MR. DINGUS:          Prefer not to get into it.

MR. SMITH:           Goes to show nobody was concerned about him killing his wife, all the concern was about him killing himself.

THE COURT:          Again, we are not trying what her opinion was or what her fears were because this is third person.  I don't see how that's relevant.  If it were the other way around I wouldn't let it in, you wouldn't want it in.  If she called and said he's going to kill his wife, you wouldn't want it in so I don't think it's proper in this situation.

[End of side bar conference]

BY MR. SMITH:

Q.        You say you don't remember if anybody called or not?

A.        I gave my statement to the police.

(Doc. 14, Ex. B, Vol. II at 69-71).

Petitioner failed to demonstrate that the trial court's ruling was erroneous.  Defense counsel was attempting to introduce Ms. Ranier's out-of-court-statement that Petitioner intended to shoot himself to show that Petitioner intended to shoot himself.  Thus, the statement was hearsay.  Furthermore, even if the trial court's limitation of cross-examination constituted error, such error was harmless.  Odie Ranier testified that after Petitioner purchased the gun, but before he took possession of it, he told her he was going to kill himself the following Tuesday (two days prior to the murder) (Doc. 14, Ex. B, Vol. III at 80-82).  Ms. Ranier testified that she attempted to prevent him from obtaining the gun by calling the pawn shop and asking them not to give it to him (*id.*).  Thus, Ms. Ranier's statement to Ms. Malki was presented to the jury.  Furthermore, Petitioner failed to show that the trial court's ruling prevented him from bolstering Ms. Ranier's testimony, as Ms. Malki stated that she did not recall whether anyone called the pawn shop regarding Petitioner.  Therefore, the appellate court's denial of Petitioner's claim was not unreasonable.

I.        Ground twelve:  Trial court abused its discretion by admitting Petitioner's statement to police at the hospital while Petitioner was under the influence of narcotics.[10]

---

[10]The court has restated the claim listed on page 5d of the amended petition (*see* Doc. 6).  On page 5d, Petitioner states as Ground twelve a claim of ineffective assistance of counsel for failing to seek suppression of the statement to police.  However, Petitioner raised the ineffective assistance claim as Ground three in the amended petition (*see id.* at 5), and the undersigned addressed it as Ground three in this Report and Recommendation.  Furthermore, the additional pages incorporated into the amended petition state Ground twelve as trial court error by admitting the statement, not ineffective assistance of counsel (*id.* at 34-35), and Petitioner states he exhausted Ground twelve by raising it as Issue IV in his direct appeal (*id.* at 5d).  The record shows that Issue IV was a claim of trial court error by admitting the

Petitioner claims that the trial court violated his Fifth and Fourteenth Amendment rights by admitting into evidence Petitioner's statement to police from his hospital bed while he was under the influence of narcotics (Doc. 6 at 34).  Petitioner's argument is two-fold:  (1) the trial court violated his due process rights by failing to conduct a <u>Jackson-Denno</u> hearing to determine whether his statement to police was involuntary before permitting it to be heard by the jury, and (2) the trial court erred in determining that Petitioner's waiver of his <u>Miranda</u> rights was knowing and voluntary (Doc. 6 at 34-35, supporting memorandum at 40-44; Doc. 16 at 47-49).

    1.  Clearly Established Supreme Court Law

In <u>Jackson v. Denno</u>, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), the Supreme Court held that, when a defendant objects to the introduction of his statement to law enforcement as involuntary, due process requires the trial court to make an independent determination that the statement was voluntary before permitting it to be heard by the jury.  <u>Miller v. Dugger</u>, 838 F.2d 1530, 1535 (11th Cir. 1988).  The Eleventh Circuit went on to explain:

> Due process thus requires not only that a conviction not be based on an involuntary confession, but also that a trial court hold what has become known as a <u>Jackson-Denno</u> hearing when a defendant contests the voluntariness of his statement. The usual remedy for a state court's failure to hold a <u>Jackson-Denno</u> hearing is not automatic reversal or grant of the writ of habeas corpus but rather a remand to the state trial court for a reliable evidentiary hearing on the limited issue of the confession's voluntariness.  <u>Jackson v. Denno</u>, 378 U.S. at 393-94, 84 S.Ct. at 1789-90.  For a habeas petitioner to be entitled to this relief, however, he must allege some facts that would indicate the involuntariness of his confession.

<u>Miller</u>, 838 F.2d at 1536.  These facts must show the existence of police overreaching that rises to the level of a due process violation.  <u>Id.</u> at 1536-37 (citing <u>Colorado v. Connelly</u>, 479 U.S. 157, 107 S.Ct. 515, 519-22, 93 L.Ed.2d 473 (1986)).

In <u>Moran v. Burbine</u>, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), the Supreme Court set forth the two-part inquiry into whether a defendant's waiver of rights guaranteed by <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) was voluntary, knowing, and intelligent.  First, the relinquishment of the right must have been voluntary in the sense that it

---

statement to police (*see* Doc. 14, Ex. D at i).  Moreover, Petitioner identifies Ground twelve as one of trial court error in his reply to Respondent's response (*see* Doc. 16 at 40-49).

was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Moran, 475 U.S. at 421. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Id.* Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived. *Id.* (quoting Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979)) (citations omitted); *see also* Hart v. Attorney General of State of Florida, 323 F.3d 884, 891 (11th Cir. 2003) (adopting two-part Moran inquiry).

As to the first prong, whether the waiver was made voluntarily, the fact that a defendant suffers a mental disability (drug-induced or otherwise) does not, by itself, render a waiver involuntary; there must be coercion by an official actor. United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995) (citing Colorado v. Connelly, 479 U.S. 157, 169-70, 107 S.Ct. 515, 522-23, 93 L.Ed.2d 473 (1986); Coleman v. Singletary, 30 F.3d 1420 1426 (11th Cir. 1994); Purvis v. Dugger, 932 F.2d 1413, 1422-23 (11th Cir. 1991), *cert. denied*, 503 U.S. 940, 112 S.Ct. 1485, 117 L.Ed.2d 627 (1992)). As to the second prong, whether the waiver was made with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," *see* Moran, 475 U.S. at 421, a defendant's impaired mental state (drug induced or otherwise) may prevent that person from understanding the nature of his waiver. *See* Barbour, 70 F.3d at 585 (citing Coleman, 30 F.3d at 1426).

b.      Federal Review of State Court Decision

Petitioner raised this claim in the direct appeal of his conviction. The First DCA affirmed the conviction per curiam. Although the state court denial of Petitioner's claim without opinion provides no guidance to this court in determining the rationale for its decision, this court must still defer to the state court decision unless review of the record shows that decision to be unreasonable. *See* Helton, 233 F.3d at 1326-27; Delgado, 223 F.3d at 982; Hannon, 109 F.3d at 335.

At trial, defense counsel moved to exclude Petitioner's statement on the ground that Petitioner's medical condition rendered him incapable of knowingly and intelligently making the statement (Doc. 14, Ex. B, Vol. III at 3-5). In support of the motion, defense counsel introduced portions of Petitioner's medical records showing his medical condition and the medications he was

taking at the time of the statement (*id*. at 5).  Counsel argued that under <u>Reddish v. State</u>, 167 So.2d 858 (Fla. 1964), the court could determine whether the combination of his physical condition and the medication rendered him unable to fully appreciate the significance of his statement (*id*. at 3-5).

The prosecutor proffered the testimony of two police officers who took the statement from Petitioner (*id*. at 7).  The proffer included the fact that the officers reviewed a waiver of rights form with Petitioner and asked him if he understood it; Petitioner signed the waiver; the officers read it to Petitioner again and confirmed that he understood it; Petitioner responded that he wished to waive his rights; and the officers observed no impediment in Petitioner's ability to communicate with them and understand what they were saying (*id*. at 7-8).

The only evidence presented to the trial court was the transcript of Petitioner's statement, the State's proffer, and the medical documents.  Upon consideration of this evidence, the trial court found that although Petitioner appeared occasionally confused during the statement, he appeared to understand "where he was, who he was talking to, and what he was saying" (*id*. at 8-9).

Jimmy Cauley, one of the officers present during Petitioner's statement, testified as follows at trial:

> Q [by the prosecutor]: When you spoke to him [Petitioner], did you go through a list of questions to ensure that he knew that he had certain rights?
>
> A.     Yes, sir.
>
> . . . .
>
> Q.     Did you read those to him from a form?
>
> A.     Yes, sir.
>
> Q.     Can you read those to the jury the way you read them to him that day?
>
> A.     Before we ask you any questions you must understand your rights. You have the right to remain silent.  Anything you say can be used against you in court.  You have the right to talk to a lawyer for advice before we ask you any questions and have him with you during questioning.  If you cannot afford an attorney -- a lawyer, one will be appointed for you before any questioning if you wish.  If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time.  You also have the right to stop answering at any time until you talk to a lawyer.  And then below that there's a Waiver of Rights.  I have read this statement of my rights, and I understand what my rights are.  I am willing to make a statement and answer questions.  I do not want a

lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Q.      Did you read that form to him the same way you just read it here today?

A.      Yes.  And I also showed it to him and let him read it hisself [sic].

Q.      Did he seem to have any difficulty reading or understanding the form?

A.      No, sir.

Q.      Did he seem to have any difficulty speaking with you?

A.      No, sir.

Q.      Okay.  Was there anything that you noted about his physical or medical condition that in your opinion was stopping him from understanding you in any way?

A.      No, sir.

Q.      Okay.  Did you then take a taped statement from him?

A.      Yes, I did.

Q.      Okay.  After turning the tape on, did you again go over his rights with him?

A.      Yes, sir.

Q.      Did he indicate that he wanted to go ahead and speak to you at that time?

A.      Yes, he did.

[The witness authenticated the taped statement and transcript thereof.]

Q.      Prior to having him give the statement, did you promise him anything of any kind in return for him giving you a statement?

A.      No, sir.

Q.      Did anyone threaten him in your presence in any way, shape, or form to get him to make a statement?

A.      No.

[The trial court admitted the tape containing the statement subject to the prior objection by defense counsel.  The tape and the transcript were published to the jury.]

. . . .

Q.      When you were talking to him, was he able to sit up and talk to you, or was he laying down in the bed?

A.      He was laying in the bed.

Q.      All right.   Was he grimacing or could you see any outward expressions of pain or confusion or anything on his face while you were talking to him?

A.      Not that I noticed.

. . . .

Q.      Okay.  There was a period in time between 2:42 p.m., when the tape was stopped, and then 2:45, when you went back on.  Was there any sort of discussion in that interim with him about anything?

A.      No.

Q.      Okay.  At any time during that interim did he do anything, say anything that indicated to you in your opinion that he was unable to continue with the conversation?

A.      No.

Q.      Okay.  Or his ability to freely and voluntarily talk with you?

A.      No.

Q.      Did there appear to be anything about his physical condition that showed confusion or misapprehension or anything?   Be that, alcohol, drugs, Demerol, pain killers, anything like that --

A.      No.

Q.      --that the hospital might've admitted to him?

A.      No.

(Doc. 14, Ex. B, Vol. III at 21-46).

On cross-examination, Mr. Cauley testified as follows:

Q.      Mr. Cauley, you were aware that Mr. Dubberly had had brain surgery in the hospital?

A.      Yes, sir.

Q.      Did you call the hospital on March 23rd, two days before the statement, and talk to the surgeon and find out whether, whether Mr. Dubberly was capable of being interviewed?

A.      I called, and I didn't talk to a surgeon.  I believe I talked to his secretary or either the nurse.

Q.      Okay.  And that was two days before the statement?

A.      I, I don't remember.  The first time I called we couldn't talk with him, and later, I don't remember if I called him or he called me and told me that, that I could talk with him.

Q.      Okay.  Was he still, was, were his wrists tied down then you talked to him?  Was he still restrained when you talked to him?

A.      I don't recall them being tied down.

(*id*. at 47).

James Merrill, an officer with the Panama City Beach Police Department, testified as follows:

Q [by the prosecutor].  You were present, as I was talking about earlier, during Mr. Dubberly's interview on the 25th.

A.      Yes, sir.

Q.      Did Mr. Dubberly do or say anything during the interview that indicated to you that he was unable to understand any questions that you were asking him?

A.      No, none whatsoever.

Q.      Was he able to speak with you freely and voluntarily?

> A.    Very much so.
>
> Q.    Okay.  At any time during your contact with him, did you at any time
> offer him any promises of leniency in return for giving a statement?
>
> A.    No, sir.
>
> Q.    Did you or anybody else in your presence threaten him in any way in
> order to get him to make a statement?
>
> A.    No, sir.  In fact, I clearly asked him that at the end of my statement.
> . . . .
> Q.    Okay.  Were there any behaviors that he did either while he was being
> taped, giving the statement or off the record, off the tape, like grimacing, expressions
> of pain, anything like that or effects of Morphine or painkillers that the hospital
> might've administered to him that indicated to you that he might not understand what
> he's talking about?
>
> A.    No, sir.  In fact, we had asked, Mr. Cauley had asked at the beginning
> of the, the interview if he felt that he was up to it and, and felt that he was certainly --
> I don't know whether the term, medicated, was used, but, but he was up to,
> physically up to speaking with us and talking about the incident.

(*id*. at 48, 66-67).

Defense counsel asked Mr. Merrill whether he talked to any doctors to determine whether

Petitioner was "up to" giving a statement (*id*. at 69).  Mr. Merrill responded that they asked the

nursing staff if Petitioner was able to give a statement (*id*.).  Defense counsel asked if a lot of the

information provided by Petitioner in the statement was inaccurate, and Merrill responded, "Some

of it" (*id.*).

On redirect, the prosecutor asked if the nursing staff said anything that indicated that

Petitioner could not speak with him or Mr. Cauley (*id*.).  Mr. Merrill responded, "Certainly not"

(*id*.).  The prosecutor asked if there was anything abut Petitioner's condition that they (the nurses)

told him that indicated that Petitioner did not have the presence of mind to give a statement, and Mr.

Merrill responded, "Certainly not" (*id*.).

Ms. Odie Ranier testified that she was a retired nurse and a friend of Petitioner's (*id.* at 76,

86).  She testified that she was present when the officers came to Petitioner's hospital room to take

Petitioner's statement (*id.* at 89).  The relevant portions of her testimony are as follows:

Q [by defense counsel].  Okay.  Now, you had occasion to visit with Mr. Dubberly in the hospital after all this happened, right?

A.      Yes, I did.

Q.      And you talked with him.  Were you present when the police officers came in--

A.      Yes, I was.

Q.      --and talked to him?  How was Mr. Dubberly acting that day?

A.      Well, that day he was, had a high temperature, and he was kind of out of it.  And the nurses had just came [sic] in and give [sic] him something.  And he wasn't having anything much to -- well, he, in fact, he wasn't talking to me at all the time.  And when they came in, they came in and told him what they came in for and asked him was he up to it.  Well, actually, he didn't know what they were talking about.

MR. DINGUS:        Objection as to her opinion, Your Honor.

THE COURT:        Sustained.  Ma'am, just, just -- would you ask her another question.

MR. DINGUS:        Move to strike.

THE COURT:        Please -- and the jury will disregard that.  Don't don't volunteer anything, please, Ms. Ranier.

Q.      (Mr. Smith continuing).      Okay.  Now, did you leave the room while they talked?

A.      They asked me to leave.

Q.      Okay.  And after they left, did you come back and visit with Mr. Dubberly some more?

A.      Yes, I did.

Q.      And how did he act?

A.      Well I went to him, and I had never mentioned the incident to him because he had asked me what was wrong with his head one day, and I said if you

don't know, I'm not gonna tell you.  And so then, after they left, he, I had taken him by the hand, and I said I'm so sorry.

> Q.      Now, while he was in the hospital was he under suicide precautions? Did they take some measures --

> A.      Yes.

> Q.      --to keep him from killing himself?

> A.      Yes.

. . . .

> Q.      Does Mr. Dubberly talk as coherently now as he did before he sot himself?

> A.      No.

> Q.      Is his memory as good now as it was before he shot himself?

> A.      No.

(*id*. at 89-91).

In Petitioner's appellate brief, he argued that the medical records introduced at trial showed that at 2:49 p.m. on March 25, 1998, when Petitioner gave a statement to the police, he was under the influence of the following prescription drugs:  (1) 75 mg. of acetamin with codeine administered at 6:00 p.m. the evening <u>before</u> the statement, (2) 75 mg of Zoloft administered at 9:00 a.m. and 75 mg administered at 12:00 p.m. on the day of the statement, and (3) Medrol administered at 1:00 p.m. on the day of the statement (Doc. 14, Ex. C at 37).  The medical records also showed that on March 23, 1998, two days before the statement, Petitioner's doctor noted that Petitioner was "not capable of an interview," and "does not seem to be oriented in time and place" (*id*. at 38).  The day after the interview, a doctor noted that Petitioner was "severely depressed," and "still not ready to talk or say anything," and that Petitioner should be continually monitored as the risk of suicide was "significant" (*id*.).

Petitioner also argued that the inconsistencies in his statement demonstrated that he was "not of sound mind" when he gave the statement, nor could he appreciate the consequences of talking to the police (Doc. 14, Ex. C at 39).  For example, Petitioner stated that he worked for "B.J.

Honeywell" or "Burns and Rowe," and then stated he worked for the "Panama City Shipping Company" (*id*. at 39-40). Petitioner inexplicably and repeatedly burst into laughter during his statement (*id*. at 40). Petitioner denied that he and his wife were divorced on the day of the shooting, then later stated they had been divorced in 1994, but the uncontroverted trial testimony showed that they were divorced in 1996 (*id*.). Petitioner denied he was drinking on the day of the shooting, and then immediately admitted he was drinking quite a bit (*id*.). Petitioner first stated he was working for a company from Florida and then stated he was working for a company from Louisiana (*id*.). Finally, Petitioner inexplicably referred to a Wal-Mart store as "the 308 store" (*id*.).

Petitioner's assertion that the trial court failed to make an independent determination regarding the voluntariness of his statement to police and his <u>Miranda</u> waiver before permitting the statement to be heard by the jury is conclusively refuted by the record. The trial transcript shows that the State proffered the statement, the parties were heard on the issue of the voluntariness of the statement and the waiver, and the court made an independent determination that the statement was knowing and voluntary and Petitioner voluntarily waived his rights, prior to allowing the statement to be heard by the jury (Doc. 14, Ex. B, Vol. III at 3-9).

Furthermore, the record does not reveal any evidence of police overreaching that would render Petitioner's statement involuntary. Petitioner alleges the following:

> If the trial court had investigated this properly, Petitioner would have pointed out that when interrogator Cauley inquired of the medical staff at the hospital if Petitioner was in any condition to be questioned, he was told Petitioner was not, and only Dr. Springer could okay an interrogation. Cauley went ahead and interrogated Petitioner and there is no indication Dr. Springer was consulted.

(Doc. 16 at 47-48). The record shows that at trial, Mr. Cauley testified that Dr. Stringer communicated his authorization through his secretary or a nurse (Doc. 14, Ex. B, Vol. III at 47). Petitioner has failed to proffer any evidence in support of his claim that Mr. Cauley did not have authorization from medical staff to conduct the interrogation. Accordingly, he has failed to establish his entitlement to relief on this ground.

Additionally, Petitioner has failed to demonstrate his entitlement to relief on his <u>Miranda</u> claim. As to the first prong of the <u>Moran</u> analysis, Petitioner failed to show that the police officers took advantage of his mental condition. As discussed *supra*, the officers testified that they were

informed by hospital personnel that Petitioner was capable of giving an interview.  Petitioner has offered nothing but speculation that the officers were lying.  Absent any evidence of intimidation, psychological or physical coercion, or deception on the part of the police officers, there is no basis for declaring Petitioner's statements and waiver of his <u>Miranda</u> rights involuntary.

The second prong of the waiver analysis requires the court to determine whether the waiver was made with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Moran</u>, 475 U.S. at 421.  Petitioner argues that because of his severe depression, as well as the fact that he had just had brain surgery and was under the influence of acetamin with codeine, Zoloft, and Medrol, he was unaware of the consequences of abandoning his rights, that is, he did not abandon them knowingly and intelligently.  However, in light of the fact that the only evidence presented to the trial court was the transcript, the officers' proffered testimony, and the medical documents, which were devoid of any indication of the effect of the medications and surgery on his mental capacity, this court cannot conclude that the state court decision that Petitioner was aware of the nature of his rights and the consequences of waiving them, and he voluntarily decided to waive his rights, was based upon an unreasonable determination fo the facts, or contrary to or an unreasonable application of Supreme Court law.

Moreover, even if the trial court erred in admitting the statement, the error was harmless. It is well settled that the admission of uncoerced statements obtained in violation of <u>Miranda</u> can be harmless error.  *See* <u>Miller v. Dugger</u>, 838 F.2d 1530, 1540 (11th Cir. 1988) (citing <u>Christopher v. Florida</u>, 824 F.2d 836, 846 n. 23 (11th Cir. 1987); <u>Cape v. Francis</u>, 741 F.2d 1287, 1294 (11th Cir. 1984), *cert. denied*, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 245 (1985)). "If, upon its reading of the trial record, the appellate court is firmly convinced that the evidence of guilt was so overwhelming that the trier of fact would have reached the same result without the tainted evidence, then there is insufficient prejudice to mandate the invalidation of the conviction." *Id.* (citing <u>Cape</u>, 741 F.2d at 1294-95).

In the instant case, the undersigned concludes that the admission of Petitioner's statement was harmless as to the issue of his factual guilt.  As discussed *supra*, the State had other evidence that clinched the issue of premeditation, specifically, Petitioner's unchallenged statement to the paramedic that he killed his ex-wife because she divorced him, as well as the circumstantial

evidence of premeditation.  Additionally, the admission of the statement was harmless on the issue of Petitioner's defense.  Petitioner's theory of defense was that the murder was not premeditated, but a spur-of-the-moment act induced by intoxication and severe depression.   The evidence supporting the defense was the following:  (1) Petitioner's testimony denying that he premeditated the murder and describing the amount of alcohol he had consumed the day of the murder, (2) medical records showing his blood/alcohol level one hour after the murder, and (3) testimony from witnesses stating that Petitioner had a drinking problem.  The State referred to the tape only once during cross-examination of Petitioner:

> Q [by the prosecutor].  Okay.  Do you remember telling the police that you only had beer to drink that day?  You didn't have any liquor to drink?
>
> A.      Oh, yeah.
>
> Q.      You did tell the police that?
>
> A.      Well, that's what I said in the tape, yeah.
>
> Q.      Was that true?
>
> A.      No.
>
> Q.      So you didn't tell the truth to the police?
>
> A.      No.

(Doc. 14, Ex. B, Vol. III at 131-32).  Although the State relied on the content of Petitioner's statement to establish Petitioner's untruthfulness, thereby discrediting his testimony on direct, this was one of many admissions of untruthfulness elicited from Petitioner by the prosecutor (*see id.* at 132, 134, 143, 148-49).  In light of the entire trial record, there was no reasonable probability that, absent the State's use of the statement during cross-examination, the jury would have found Petitioner's testimony that he did not premeditate the murder believable.  Thus, admission of the statement was harmless as to Petitioner's defense.  Accordingly, Petitioner is not entitled to federal habeas relief on his claim of trial court error.

> J.      Ground thirteen:  Trial court abused discretion in refusing to permit witness to testify as to Petitioner's state of mind when statements taken.

Petitioner claims that the trial court denied him the right to confront witnesses by striking the testimony of Odie Ranier that Petitioner was in a confused mental state when the police interrogated him (Doc. 6 at 5d, 35-36). Petitioner claims the opinion testimony of Ms. Ranier was admissible under Florida Statutes section 90.701, and the trial court's exclusion of the testimony rendered the trial unfair.

        1.      Clearly Established Supreme Court Law

The clearly established federal law applicable to claims of denial of the right to confront witnesses was set forth *supra*. Petitioner must show that the trial court erroneously limited cross-examination of a prosecution witness, and that the error was not harmless.

        2.      Federal Review of State Court Decision

The following is the relevant testimony of Mr. Ranier:

Q [by defense counsel]. Okay. Now, you had occasion to visit with Mr. Dubberly in the hospital after all this happened, right?

A.     Yes, I did.

Q.     And you talked with him. Were you present when the police officers came in--

A.     Yes, I was.

Q.     --and talked to him? How was Mr. Dubberly acting that day?

A.     Well, that day he was, had a high temperature, and he was kind of out of it. And the nurses had just came [sic] in and give [sic] him something. And he wasn't having anything much to -- well, he, in fact, he wasn't talking to me at all at the time. And when they came in, they came in and told him what they came in for and asked him was he up to it. Well, actually, he didn't know what they were talking about.

MR. DINGUS:       Objection as to her opinion, Your Honor.

THE COURT:       Sustained. Ma'am, just, just -- would you ask her another question.

MR. DINGUS:       Move to strike.

THE COURT:          Please -- and the jury will disregard that.  Don't don't volunteer anything, please, Ms. Ranier.

(Doc. 14, Ex. B, Vol. III at 89).

As noted *supra*, Florida law provides:

**90.701. Opinion testimony of lay witnesses**

If a witness is not testifying as an expert, the witness's testimony about what he or she perceived may be in the form of inference and opinion when:

(1) The witness cannot readily, and with equal accuracy and adequacy, communicate what he or she has perceived to the trier of fact without testifying in terms of inferences or opinions and the witness's use of inferences or opinions will not mislead the trier of fact to the prejudice of the objecting party; and

(2) The opinions and inferences do not require a special knowledge, skill, experience, or training.

Fla. Stat. § 90.701.

Initially, Petitioner's contention that the trial court instructed the jury to disregard all of Ms. Ranier's testimony is a mischaracterization.  The trial transcript establishes that the prosecutor objected only to Ms. Ranier's opinion that "he [Petitioner] didn't know what they [the police] were talking about."  The trial court sustained the objection and instructed the jury to disregard that testimony.  The prosecutor did not object to Ms. Ranier's testimony that Petitioner had a high temperature and appeared "kind of out of it," that the nurses had just given Petitioner medication, and that Petitioner was not talking to her at all.  Thus, the jury heard Ms. Ranier's observations of Petitioner's condition at the time of the interrogation.

Additionally, the Confrontation Clause applies to witnesses against the accused.  *See* Crawford v. Washington, 541 U.S. 36, 51, 124 S.Ct. 1354, 1364, 158 L.Ed.2d 177 (2004).  In the instant case, Ms. Ranier was Petitioner's own witness (*see* Doc. 14, Ex. B, Vol. III at 75).  Therefore, Petitioner cannot state a claim of a Confrontation Clause violation.

Furthermore, even if the trial court erroneously excluded Ms. Ranier's opinion that Petitioner did not understand the conversation with police, the error was harmless.  Ms. Ranier's testimony that Petitioner was "kind of out of it," that the nurses had just given Petitioner medication, and that Petitioner was not communicating with her placed the jury in possession of an accurate reproduction

of Ms. Ranier's perception of Petitioner's mental condition at the time of his statement to police. Thus, Petitioner is not entitled to federal habeas relief on this claim. *See* Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (to warrant federal habeas relief, a state court's erroneous ruling must have "had substantial and injurious effect or influence in determining the jury's verdict.").

     K.    Ground fourteen: Trial court abused its discretion in allowing a fellow prosecutor, not on witness list, to offer lay opinion.

     Petitioner next claims that the trial court violated his right to confront witnesses by allowing Bill Lewis to testify that alcoholics are better able to handle their alcohol than non-alcoholics, and that a person must consume more alcohol to become intoxicated than impaired (Doc. 6 at 5e, 37). Petitioner contends that Lewis was offering a lay opinion about matters that required expert testimony (*id.*).

     Respondent argues that Petitioner failed to raise his Confrontation Clause claim in the state courts, and he is now procedurally barred from doing so (Doc. 13 at 99). Therefore, although the claim is technically exhausted, the claim is procedurally barred from federal review (*id*. at 99-100).

     In Petitioner's brief to the state appellate court, he did not refer to his right to confront witnesses or any other federal constitutional issue, and none of the cases cited in his direct appeal discussed the Federal Constitution (*see* Doc. 14, Ex. C at 44-47). The section of Petitioner's appellate brief which dealt with the trial court's admission of Mr. Lewis' testimony does not contain any reference to Petitioner's rights under the federal Confrontation Clause. (*id.*). The only cases cited in the discussion of the issue in Petitioner's state appellate brief were state court cases that made no mention of the United States Constitution and cited no federal cases. The legal treatises on which Petitioner relied were treatises on the Florida Evidence Code. (*id.*). Therefore, this court concludes that Petitioner failed to fairly present his federal claim to the state courts.

     Furthermore, Petitioner is now precluded under state law from re-arguing the issue on appeal. As discussed *supra*, an issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. *See* O'Sullivan, 526 U.S. at 839-40, 848.

Moreover, Petitioner has failed to demonstrate cause for his failure to present his Confrontation Clause claim to the state courts.  Petitioner does not allege that he received ineffective assistance of appellate counsel for failure to raise the Confrontation Clause issue on appeal, nor has he shown that his trial counsel was ineffective for failing to properly preserve it.  Indeed, there was no meritorious basis for either trial or appellate counsel to raise a Confrontation Clause claim in the state courts because the trial transcript shows that the trial court did not in any way limit either defense counsel's voir dire of Mr. Lewis during the State's proffer, or defense counsel's cross-examination of Mr. Lewis during trial (*see* Doc. 14, Ex. B, Vol. IV at 25-42, 45).  Therefore, Petitioner is not entitled to federal habeas review of his Confrontation Clause claim.

To the extent Petitioner otherwise seeks federal review of the trial court's determination that Mr. Lewis was competent to testify to the matters to which he testified, federal habeas review is not available.  The state court's resolution of Petitioner's claim of trial court error was based entirely on state law, as Petitioner argued only state law grounds in his appellate brief (*see* Doc. 14, Ex. C at 44-47), and the appellate court affirmed per curiam.  In habeas corpus proceedings, it is not within the province of the federal court "to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).  Petitioner has neither pleaded any constitutional violation, except the Confrontation Clause violation addressed *supra*, nor cited any Supreme Court case in support of his claim of trial court error; he references only sections of the Florida Evidence Code, state cases, and a treatise on the Florida Evidence Code in support of his claim.  Furthermore, he has not shown why the trial court's decision finding Mr. Lewis competent to testify was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.  Therefore, Petitioner is not entitled to federal habeas relief on this claim.  *See* Newton v. Kemna, 354 F.3d 776, 782-83 (8th Cir. 2004) (where state courts' resolution of petitioner's claim that trial court erred in finding a witness competent to testify without first examining her psychiatric records, was based entirely on state law, it was not within province of federal habeas court to reexamine state court determination on state law question).

Moreover, to the extent Petitioner's claim is liberally construed as implicating due process concerns, despite the fact that Petitioner is not proceeding pro se in this federal habeas proceeding, his claim is without merit.   Due process concerns are implicated only where "the challenged testimony is crucial, critical or highly significant," and the trial court fails to conduct an appropriate competency hearing.   *See* Sinclair v. Wainwright, 814 F.2d 1516, 1522-23 (11th Cir. 1987) (citation omitted).   In the instant case, the record is clear that the trial court conducted an appropriate hearing to determine the competency of Mr. Lewis to testify (Doc. 14, Ex. B, Vol. IV at 25-39).   After thorough voir dire by defense counsel, the court concluded that Mr. Lewis was qualified to testify to the matters included in his testimony, based upon his special knowledge, training, and experience as a law enforcement officer (*id*.).   As the record establishes that the trial court conducted an appropriate hearing on Mr. Lewis' competency as a witness, Petitioner has failed to establish a due process violation.

L.      Ground fifteen:   Trial court deprived Petitioner of right of confrontation by failing to find a Richardson[11] violation on unlisted rebuttal witness.

Petitioner claims that the trial court denied his right to confront Ruthie Clieland by permitting her testimony on rebuttal despite the State's failure to disclose her as a witness during discovery (Doc. 6 at 5e, 38).

As with Petitioner's previous claim, Respondent argues that Petitioner failed to raise his Confrontation Clause claim in the state courts, and he is now procedurally barred from doing so (Doc. 13 at 99).   Therefore, although the claim is technically exhausted, the claim is procedurally barred from federal review (*id*. at 107-08).

In Petitioner's brief to the state appellate court, he did not refer to his right to confront witnesses or any other federal constitutional issues, and none of the cases cited in his direct appeal

---

[11]Richardson v. State, 246 So.2d 771 (Fla. 1971).   Under Richardson, when it is brought to the attention of the trial court that the State has failed to comply with the Florida Rules of Criminal Procedure regarding disclosure of witnesses, the court must make an adequate inquiry into all of the surrounding circumstances, including whether the State's violation was inadvertent or wilful, whether the violation was trivial or substantial, and most importantly, what effect, if any, did it have upon the ability of the defendant to properly prepare for trial. 246 So.2d at 775.   Once the court has considered all of the circumstances, it has authority to enter such order as it deems just.   *Id.*   However, in those cases where the court determines that the state's noncompliance with the procedural rule has not prejudiced the ability of the defendant to properly prepare for trial, the circumstances establishing non-prejudice to the defendant must affirmatively appear in the record.   *Id.*

discussed the Federal Constitution (*see* Doc. 14, Ex. C at 47-50).  The section of Petitioner's appellate brief which dealt with the trial court's permitting Ms. Clieland's testimony despite the alleged discovery violation does not contain any reference to Petitioner's rights under the federal Confrontation Clause. (*id.*).  The only cases cited in the discussion of the issue in Petitioner's state appellate brief were state court cases that made no mention of the United States Constitution and cited no federal cases. Therefore, this court concludes that Petitioner failed to fairly present his federal claim to the state courts.

Furthermore, Petitioner is now precluded under state law from re-arguing the issue on appeal. As discussed *supra*, an issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review.  *See* O'Sullivan, 526 U.S. at 839-40, 848.

Moreover, Petitioner has failed to demonstrate cause for his failure to present his Confrontation Clause claim to the state courts.  Petitioner does not allege that he received ineffective assistance of appellate counsel for failure to raise the Confrontation Clause issue on appeal; nor has he shown that his trial counsel was ineffective for failing to properly preserve it.  Indeed, there was no meritorious basis for either trial or appellate counsel to raise a Confrontation Clause claim in the state courts because the trial transcript shows that the trial court did not in any way limit either defense counsel's voir dire of Ms. Clieland during the State's proffer, or defense counsel's cross-examination of Ms. Clieland during trial (*see* Doc. 14, Ex. B, Vol. IV at 53-54, 63-65).  Therefore, Petitioner is not entitled to federal habeas review of his Confrontation Clause claim.

To the extent Petitioner otherwise seeks federal review of the trial court's decision to permit Ms. Clieland to testify despite the State's failure to disclose her as a witness in discovery, federal habeas review is not available.  The state court's resolution of Petitioner's claim of trial court error was based entirely on state law, as Petitioner argued only state law grounds in his appellate brief (*see* Doc. 14, Ex. C at 47-50), and the appellate court affirmed per curiam.  As discussed *supra*, it is not within the province of the federal court to reexamine state-court determinations on state-law questions.  Petitioner has neither pleaded any federal constitutional violation, except the Confrontation Clause violation addressed *supra*, nor cited any Supreme Court case in support of his claim of trial court error.  Furthermore, he has not shown why the trial court's permitting Ms.

Clieland to testify was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.  Therefore, Petitioner is not entitled to federal habeas relief on this claim.

      M.    <u>Ground sixteen:  The cumulative impact of errors Ground I through XV of deprived Petitioner of the right to a fundamentally fair trial.</u>

      As his final claim, Petitioner asserts that the cumulative impact of the errors listed in the previous grounds deprived him of the right to a fundamentally fair trial (Doc. 6 at 5e - 5f, 39-40). As previously discussed, none of the seven alleged errors of trial counsel, considered alone, approach the threshold standard of ineffective assistance of counsel. Taken together, their cumulative effect also falls far short of depriving Petitioner of effective assistance of counsel or of rendering Petitioner's trial fundamentally unfair.

      Likewise, as previously discussed, of the five alleged trial court errors analyzed on the merits, none of them, considered alone, approach the threshold of fundamental unfairness.  Taken together, their cumulative effect also falls far short of rendering Petitioner's trial fundamentally unfair.  The remaining two alleged trial court errors are not entitled to federal habeas review because they were procedurally defaulted.  Therefore, Petitioner is not entitled to relief on his claim.  *See* <u>Bronstein v. Wainwright</u>, 646 F.2d 1048 (11th Cir. 1981) ("[A] state trial must be so 'fundamentally unfair' as to amount to a denial of due process before federal habeas relief can be appropriately applied.") (internal quotation and citation omitted).


      Accordingly, it is **ORDERED**:

      The clerk of court is directed to change the docket to reflect that James R. McDonough is substituted for James V. Crosby, Jr. as Respondent.

      And it is respectfully **RECOMMENDED**:

      That the amended petition for writ of habeas corpus (Doc. 6) be **DENIED**.

      At Pensacola this <u>27th</u> day of April 2006.


                     */s/ Elizabeth M. Timothy*           
                     **ELIZABETH M.  TIMOTHY**

**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof.  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).